UNITED STATES DISTRICTCOURT
FOR THE DISTRICT OF COLUMBIA


CONSUMERS FOR AUTO RELIABILITY    )
AND SAFETY, et al.,    )
    )
    )
    Plaintiffs    )
    )    No. 17-00540 (KBJ)
v.    )
    )
FEDERAL TRADE COMMISSION,    )
    )
    )
    Defendant.    )


**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**


Katherine A. Meyer
Meyer Glitzenstein & Eubanks
4115 Wisconsin Ave., N.W. Suite 210
Washington, D.C.  20016
(202) 588-5206
(202) 588-5049 (fax)
Kmeyer@meyerglitz.com

Attorney for Plaintiffs

Date:  October 6, 2017

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ........................................................................................... ii

Introduction ............................................................................................................................1

BACKGROUND ...................................................................................................................4

A.   Statutory and Regulatory Framework ...................................................................4

B.   The Commission's Decisions That It Is Not a "Deceptive Practice" Under
     Section 5 of the FTC Act for Auto Dealers to Advertise and Market
     "Certified" Used Cars as "Safe," "Repaired for Safety," or "Subject to a
     Rigorous Inspection" When Such Vehicles Are Subject to Pending Safety
     Recalls. ...............................................................................................................6

     1.   Plaintiffs' CarMax Petition ......................................................................6

     2.   The FTC's First Set of Decisions. ............................................................9

     3.   The FTC's Second Set of Decisions. ......................................................14

C.   Plaintiffs' Challenge ..........................................................................................16

ARGUMENT .......................................................................................................................18

PLAINTIFFS' CHALLENGE IS REVIEWABLE BY THIS COURT. ...........................18

A.   The Court May Review A Claim That A Consent Decree Violates A Statute or
     Regulation. .........................................................................................................18

B.   The Agency's Decisions Constitute an Interpretative Rule and General Statement
     of Policy That May Be Reviewed By This Court. .............................................25

C.   Plaintiffs Have Standing. ...................................................................................29

     1.   Injury-in-Fact .........................................................................................29

     2.   Causation. ...............................................................................................31

     3.   Redressability .........................................................................................33

CONCLUSION ...................................................................................................................36

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE**

*Am. Bar Ass'n v. FTC*,
   671 F. Supp. 2d 64 (D.D.C. 2009) .......................................................................4

*Animal Legal Def. Fund v. Glickman*,
   154 F.3d 426 (D.C. Cir. 1998) ......................................................................32, 33

*Ass'n of Data Processing Serv. Org., v. Camp*,
   397 U.S. 150 (1970)........................................................................................31

*Ass'n of Nat'l Advertisers v. FTC*,
   617 F.2d 611 (D.C. Cir. 1979).........................................................................4

*Citizens for a Better Env't v. Gorsuch*,
   718 F.2d 1117 (D.C. Cir. 1983) ......................................................................21

*Citizens to Preserve Overton Park v. Volpe*,
   401 U.S. 402 (1971)........................................................................................22

*Conservation Nw. v. Sherman*,
   715 F.3d 1181 (9th Cir. 2013) ........................................................................20

*Consumers for Auto Reliability et al. v. Federal Trade Commission*,
   No 17-1038 (D.C. Cir. Feb. 6, 2017) ............................................................16, 17

*Consumers for Auto Reliability et al. v. Federal Trade Commission*,
   No. 17-1125 (D.C. Cir. July 27, 2017) ...........................................................16

*Crowley Caribbean Transp., Inc. v. Pena*,
   37 F.3d 671 (D.C. Cir. 1994)..........................................................................28

*Defenders of Wildlife v. Gutierrez*,
   532 F.3d 913 (D.C. Cir. 2008).......................................................................29, 32

*Edison Elec. Inst. v. EPA*,
   996 F.2d 326 (D.C. Cir. 1993)........................................................................23

*Exec. Bus. Media v. U.S. Dep't of Justice*,
   3 F.3d 759 (4th Cir. 1993) .............................................................................20

*Fed. Election Comm'n v. Akins*,
   524 U.S. 11 (1998)..........................................................................................33

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*,
   528 U.S. 167 (2000)......................................................................................31, 33

*Heckler v. Chaney*,
    470 U.S. 821 (1985)..................................................................16, 17, 18, 22, 23, 25

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers v. Brock*,
    783 F.2d 237 (D.C. Cir. 1986) .........................................................2, 3, 23, 24, 28

*Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*,
    478 U.S. 501 (1986)..............................................................................................20

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)..............................................................................................29

*Motor & Equipment Mfrs. Ass'n v. Nichols*,
    142 F3d 449 (D.C. Cir. 1998).........................................................................8, 32

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*,
    366 F.3d 930 (D.C. Cir. 2004) ............................................................................35

*Neustar, Inc. v. FCC*,
    857 F.3d 886 (D.C. Cir. 2017) ............................................................................27

*Perez v. Mortgage Bankers Ass'n*,
    135 S. Ct. 1199 (2015)..........................................................................................26

*Scanwell Labs. v. Shaffer*,
    424 F.2d 859 (D.C. Cir. 1970) ............................................................................21

*Schering Corp. v. Heckler*,
    779 F.2d 683 (D.C. Cir. 1985) ......................................................................24, 25

*Shalala v. Guernsey Mem'l Hosp.*,
    514 U.S. 87, 99 (1995).........................................................................................26

*Soundboard Ass'n v. FTC*,
    No. 17–cv–00150, 2017 WL 1476116 (D.D.C. Apr. 24, 2017) ..............4, 5, 26, 28

*Tozzi v. U.S. Dep't of Health & Human Servs.*,
    271 F.3d 301 (D.C. Cir. 2001) ............................................................................33

*Transp. Intelligence, Inc. v. FCC*,
    336 F.3d 1058 (D.C. Cir. 2003) ..........................................................................23

*United States v. Carpenter*,
    526 F.3d 1237 (9th Cir. 2008) ............................................................................20

*Watt v. Energy Action Educ. Found.*,
    454 U.S. 151 (1981)..............................................................................................29

## STATUTES

5 U.S.C. § 701(a)(2) ............................................................................................22, 23

5 U.S.C. § 706(2) ....................................................................................................2, 26

15 U.S.C. § 45(a) ..............................................................................2, 4, 6, 8, 10, 19

15 U.S.C. § 45(c) ..........................................................................................16, 17, 18

15 U.S.C. § 57a(a) .......................................................................................3, 4, 17, 25

15 U.S.C. § 57a(e) ...................................................................................................16

49 U.S.C. § 30102 ................................................................................................7, 31

49 U.S.C. § 30112 .....................................................................................................7

49 U.S.C. § 30120 ...........................................................................................8, 27, 28

Transportation Recall Enhancement Accountability and Documentation Act
  Pub. L. 106-414, § 8, 114 Stat. 1800, 1805 (2000) ...........................................8

Raechel and Jacqueline Houck Safe Rental Car Act,
  Pub. L. 114-94, 129 Stat. 1706, § 24109(a) (2015) ....................................7, 8, 31

CAL. VEH. CODE § 24011 (West 2016) .........................................................................34

## OTHER AUTHORITIES

16 C.F.R. § 455.1(a)(1) ............................................2, 5, 8, 18, 20, 26, 33, 34, 35

49 Fed. Reg. 45,692 (Nov. 19, 1984) ....................................................................5, 19

81 Fed. Reg. 93,926–33 (Dec. 22, 2016) ...........................................14, 15, 30, 31

81 Fed. Reg. 5751–56 (Feb. 3, 2016) ....................................................................9, 10

CAROLYN L. CARTER ET AL., UNFAIR AND DECEPTIVE ACTS AND PRACTICES
  § 3.4.5.1 (9th ed. 2016) .......................................................................................6

Cary Silverman & Johnathan L. Wilson, *State Attorney General Enforcement of
  Unfair or Deceptive Acts and Practices Laws: Emerging Concerns and
  Solutions*, 65 KAN. L. REV. 209, 212-13 (2016) ...............................................5

Rachel Abrams & Christopher Jensen, *New York City Imposes a Used-Car Repair
  Rule*, N.Y. TIMES (July 29, 2014) .......................................................................34

Richard C. Ausness et al., *Providing a Safe Harbor for Those Who Play by the
    Rules: The Case for a Strong Regulatory Compliance Defense*, 2008 UTAH L.
    REV. 115, 132 (2008) ............................................................................................35

Robert A. Anthony, *Interpretive Rules, Policy Statements, Guidance, Manuals,
    and the Like—Should Federal Agencies Use Them to Bind the Public?*, 41
    DUKE L.J. 1311, 1328-29 (1992) .......................................................................28, 29

## Introduction

Plaintiffs oppose Defendant's Motion to Dismiss, ECF No. 17-1, and request oral argument on the motion. As demonstrated more fully below, this Court has jurisdiction to review Plaintiffs' claims.

Plaintiffs challenge six "Decisions and Orders" issued by Defendant Federal Trade Commission ("FTC" or "Commission") that permit auto dealers to advertise and sell "Certified Pre-Owned" (used) vehicles as "safe," "repaired for safety issues," or "subject to a rigorous inspection," even when such vehicles are subject to pending safety defect recalls required by the National Highway Traffic Safety Administration ("NHTSA"), and despite the fact that, as the FTC has emphasized to the public on its website, *all safety recalls pose safety risks and, left unrepaired, might lead to accidents*."[1] The FTC's Decisions and Order allow these dealers to advertise and sell such vehicles as "safe," "repaired for safety issues," or "subject to a rigorous inspection" without requiring the dealers to have the safety recall defects repaired, as long as the dealers disclose that such vehicles "may" be subject to a recall.

Plaintiffs contend that the agency's decisions to allow demonstrably *unsafe* used vehicles to be advertised and sold to the public as "safe," "repaired for safety issues," or "subject to a rigorous inspection" violate Section 5 of the Federal Trade Commission Act ("FTC Act" or "Act"), 15 U.S.C. § 45(a)(1), which prohibits "unfair or deceptive acts or practices in or affecting commerce," as well as the agency's own 1984 trade regulation rule governing the sale of used cars, which provides that "[i]t is a deceptive act or practice for any used vehicle dealer . . . [t]o *misrepresent the mechanical condition of a used vehicle*[.]" 16 C.F.R. § 455.1(a)(1) (emphasis

---

[1]     *See* FTC, Consumer Information, "Buying a Used Car," (Plaintiffs' Exhibit) ("Pl. Ex.") A, https://www.consumer.ftc.gov/articles/0055-buying-used-car.

added). Accordingly, the challenged Decisions and Orders are arbitrary and capricious and not in accordance with law within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A).

The FTC's contention that these agency actions are unreviewable because they are embodied in Consent Decrees that were issued in settlement of multiple enforcement actions has no merit. Because these Decisions permit practices that violate both the statute and the agency's own prior substantive regulation governing the marketing and sale of used cars, they are properly the subject of judicial review. As the Court of Appeals for this Circuit long ago succinctly explained, "[e]ven if a statutory interpretation is announced in the course of a nonenforcement decision, that does not mean it escapes judicial review altogether." *Int'l Union, United Auto., Aerospace & Agric. Implement Workers v. Brock*, 783 F.2d 237, 246 (D.C. Cir. 1986), *rev'd on other grounds*, 869 F.2d 616 (D.C. Cir. 1989). On the contrary, the courts' "authority to interpret and implement statutory authority through adjudications has always contemplated the availability of judicial review *to ensure that the announced interpretations are consistent with the governing statute*." *Id.* (emphasis added).

The Decisions at issue also constitute "interpretative rules and general statements of policy" within the meaning of the FTC Act, 15 U.S.C. § 57a(a)(1)(A), that may be reviewed by this Court. Indeed, AutoNation—the nation's largest new car dealership chain—and Ford Motor Company, who were *not* the subject of the Decisions at issue have already changed their practice of repairing vehicles subject to safety recalls prior to sale to conform to what is now permitted by the FTC's Decisions, and the National Automobile Dealers Association, the car dealers' trade association, has made clear that is has so advised its members that they may do so. This is precisely what the Commission intended to occur. As candidly explained by the then Director of

2

the FTC's Bureau of Consumer Protection to Automotive News, the automotive industry's main

trade publication,"[w]e really do hope these actions send a signal to the marketplace as a whole.

*We really do want it to have widespread effects*." Statement of Jessica Rich, Director, FTC

Bureau of Consumer Protection, *Automotive News* (Feb. 8, 2016), Pl. Ex. B (emphasis added).

Plaintiffs have also amply alleged, and further detail in the attached Declarations, that

they have Article III standing to pursue their claims. They represent members and others who, as

a result of the FTC's actions, are being exposed to the increased risk of bodily injury and death

from unsafe cars on the nation's roads and highways, including those that they unwittingly

purchase themselves, as well as those that are being driven by others who purchase unsafe cars

believing them to be "safe" when in fact they are unsafe, defective, and subject to unrepaired

safety recalls. These members and others will also suffer the economic injury that attends

purchasing a car that they believe is "safe" when in fact it is *not* safe—including both the

diminished value of such cars, as well as the attendant burdens entailed in arranging to have

them repaired. They are also injured by having to bear the burden of ascertaining whether in fact

a particular vehicle is subject to an outstanding recall, rather than having that burden fall on the

dealers who are in a much better position to ascertain such information and make sure that such

vehicles are repaired before they are sold to the public. All of these injuries are clearly caused by

the FTC's Decisions to allow these practices, and would be remedied to a significant degree if

those unlawful Decisions were set aside.

**BACKGROUND**

A.      **Statutory and Regulatory Framework**

The FTC Act provides that "unfair or deceptive acts or practices in or affecting

commerce" are "unlawful," 15 U.S.C. § 45(a)(1), and directs the FTC "to prevent" such acts or

practices. *Id.* § 45(a)(2). The Act further provides that the agency may prescribe "interpretive

rules and general statements of policy with respect to unfair or deceptive acts or practices in or

affecting commerce. . . ." 15 U.S.C. § 57a(a)(1)(A). Challenges to such matters belong in a

federal district court. *See, e.g., Ass'n of Nat'l Advertisers v. FTC*, 617 F.2d 611, 619 (D.C. Cir.

1979) (acknowledging that a district court has jurisdiction over challenges to FTC actions not

issued as trade regulation rules); *Am. Bar Ass'n v. FTC*, 671 F. Supp. 2d 64 (D.D.C. 2009),

*vacated on other grounds*, 636 F.3d 641 (D.C. Cir. 2011); *Soundboard Ass'n v. FTC*, No. 17–cv–

00150, 2017 WL 1476116, *2 (D.D.C. Apr. 24, 2017), *appeal docketed*, No. 17–5093 (D.C. Cir.

Apr. 28, 2017).

The Commission may also prescribe substantive "rules which define with specificity acts

or practices which are unfair or deceptive acts or practices in or affecting commerce"—which are

called trade regulation rules. 15 U.S.C. § 57a(a)(1)(B). In 1984 the Commission promulgated a

trade regulation rule governing the used car industry which provides that "[i]t is a deceptive act

or practice for any used vehicle dealer, when that dealer sells or offers for sale a used vehicle in

or affecting commerce . . . *[t]o misrepresent the mechanical condition of a used vehicle*[.]" 16

C.F.R. § 455.1(a)(1) ("Used Car Rule") (emphasis added). In reaching this conclusion, the FTC

explained that "[f]or many consumers, the purchase of a used car represents a substantial,

necessary investment in a reliable means of transportation." 49 Fed. Reg. 45,692 (Nov. 19,

1984). As the agency also observed, "most consumers" are relatively "unfamiliar[] . . . with the

mechanical operation of an automobile," *id.,* and "[c]onsumers are frequently misled or deceived by affirmative misrepresentations concerning . . . the mechanical condition of used cars. *Id.* at 45,696.

Stating that "mechanical condition information is material to the used car transaction[,]" *id.* at 45,700, the agency concluded that "[d]ealer misrepresentations regarding mechanical condition are therefore deceptive acts and practices" within the meaning of Section 5 of the FTC Act, 15 U.S.C. § 45(a)(1). *Id.* Therefore, since 1984 and prior to the issuance of the Decisions at issue here, it has been a "deceptive act or practice for any used vehicle dealer . . . to misrepresent the mechanical condition of a used vehicle" that it offers for sale. *Id.* at 45,725; *see also* 16 C.F.R. § 455.1(a)(1).

The FTC's determinations as to what constitutes an "unfair or deceptive practice" within the meaning of the FTC Act has far-reaching consequences. Not only do such pronouncements govern the law that will be applied under the *federal* FTC Act, but because most *state* Unfair and Deceptive Acts or Practices statutes ("UDAPs") mirror those of the federal statute, states typically follow the FTC with regard to what they will deem to be an "unfair or deceptive" act or practice under those state laws. *See, e.g.,* Cary Silverman & Johnathan L. Wilson, *State Attorney General Enforcement of Unfair or Deceptive Acts and Practices Laws: Emerging Concerns and Solutions*, 65 KAN. L. REV. 209, 212-13 (2016) ("In determining what constitutes an 'unfair' or 'deceptive' act state courts are *often required by their UDAP statute to look to FTC policies, orders, regulations, and rulings for guidance*. This statutory deference can require the states' courts to give 'consideration' or 'due consideration and great weight' while others require interpretation of state law to be 'guided' or be 'consistent' with FTC actions." (Emphasis added)). Therefore, the FTC's actions have also impaired the likelihood that state laws will

protect consumers from the unfair and deceptive practice of advertising and selling a "certified"

used car as "safe," "repaired for safety," or "subject to a rigorous inspection," when in fact the

vehicle is dangerously *unsafe* because it is subject to an open recall.[2]

**B.**    **The Commission's Decisions That It Is Not a "Deceptive Practice" Under Section
5 of the FTC Act for Auto Dealers to Advertise and Market "Certified" Used Cars
as "Safe," "Repaired for Safety," or "Subject to a Rigorous Inspection" When Such
Vehicles Are Subject to Pending Safety Recalls.**

**1.**    **Plaintiffs' CarMax Petition**

In recent years, some car dealers have advertised and sold "Certified Pre-Owned"

vehicles as "safe," "repaired for safety," or having passed a "rigorous inspection," when such

cars have unrepaired safety problems subject to recalls under the federal Motor Vehicle Safety

Act, 49 U.S.C. §§ 30101-30183. Moreover, "certified" pre-owned cars are advertised as superior

in quality to non-certified cars, on the premise that they are subject to rigorous safety

inspections. *See, e.g., Certified Pre-Owned Pros and* Cons, KELLEY BLUE BOOK,

https://www.kbb.com/certified-pre-owned/certified-pre_owned-pros-and-cons/ (last visited Oct. 4, 2017) ("A

sense of security is the main attraction of purchasing a Certified Pre-Owned model. Like new-car

buyers, folks who drive home a certified used car shouldn't have to worry about breakdowns and

costly repairs. Although it's secondhand, the certified used vehicle is a late-model that's been

inspected prior to certification"). Certified used cars also cost more than non-certified cars,

again, because they are supposed to give consumers "peace of mind" as having been thoroughly

---

[2]        Thus, most state UDAP statutes declare that "it is the intent of the legislature that in
construing . . . this Act the courts will be guided by the interpretations given by the Federal
Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission
Act (15 U.S.C. 45(a)(1))." *See* CAROLYN L. CARTER ET AL., UNFAIR AND DECEPTIVE ACTS AND
PRACTICES § 3.4.5.1 (9th ed. 2016). In states with this statutory provision, courts show great
deference to FTC decisions and other FTC guidelines when interpreting the state UDAP statute.
*See id.* & n.218 (collecting state law cases).

inspected to eliminate all safety issues. *Id.*

Since the Motor Vehicle Safety Act was enacted, it has been illegal under that statute for any auto dealer to sell a *new* car that is subject to a safety recall. 49 U.S.C. §§ 30112. The Motor Vehicle Safety Act also requires car manufactures to bear the expense entailed in repairing a car that is subject to a safety recall, for fifteen years after the car was manufactured. *Id.* § 30120. Thus, used car dealers do not bear this cost when they arrange to have such vehicles repaired prior to selling them to consumers. In addition, in 2015 Congress enacted the Raechel and Jacqueline Houck Safe Rental Car Act, Pub. L. 114-94, 129 Stat. 1706, § 24109(a) (2015) (amending 49 U.S.C. §§ 30102, 30120, 30122, and 30166, and enacting provisions set out as notes under 49 U.S.C. § 30102), which prohibits rental car companies (including auto dealers who rent cars) with fleets of more than 35 vehicles from renting, loaning, or selling unrepaired recalled used vehicles, at wholesale or retail, after they receive a safety recall notice.

However, currently there is no federal statute that requires all car dealers to ensure that safety recall repairs are in fact performed on used cars. As the General Accounting Office has reported to Congress, "[w]ith over 35 million used cars sold by used and franchised dealerships in the United States . . . alone, *this could pose a significant risk to the safety of millions of vehicle drivers*." U.S. GOV'T ACCOUNTABILITY OFF., GAO-11-603, AUTO SAFETY: NHTSA HAS OPTIONS TO IMPROVE THE SAFETY DEFECT RECALL PROCESS, at 29 (June 2011) (emphasis added). Indeed, as mentioned *supra*, the FTC itself advises consumers on its website that "*all safety recalls pose safety risks and, if left unrepaired, might lead to an accident*." Pl. Ex. A (emphasis added).

The FTC wrongly states in its brief that "federal law allows auto dealers to sell used cars with open recalls," Defendants' Memorandum In Support of Motion to Dismiss ("Def. Mem.")

at 11, which would explain why the FTC failed to provide any citation for this statement. In fact, there is no federal law that *permits* the sale of such cars, and, as noted above, one statute—the Raechel and Jacqueline Houck Safe Rental Act of 2015—actually prohibits car companies that rent cars from renting, loaning, or selling used cars that are subject to safety recalls. In addition, the FTC clearly has the authority to deem car dealers' false and deceptive advertising regarding the safety of used cars they offer for sale as unlawful deceptive practices under Section 5 of the FTC Act. *See* 15 U.S.C. § 45(a)(2). In fact, as explained above, in 1984 the FTC exercised this authority by declaring that it is a deceptive practice for a used car dealer to "misrepresent the mechanical condition" of a car. 16 C.F.R. § 455.1(a)(1).[3]

Therefore, on June 23, 2014, Plaintiffs and other consumer protection groups petitioned the FTC to remedy this deceptive practice with respect to CarMax—the nation's largest retailer of used cars. *See* Pl. Ex. C. Plaintiffs explained that CarMax's practice of advertising and selling used cars as "CarMax Quality Certified" and having passed a "rigorous inspection," when those cars are subject to unrepaired safety recalls is "dangerously deceptive, since [it] tend[s] to lull car buyers into a false sense of security regarding the safety of used vehicles." *Id.* at 2. In response, the FTC declined to grant Plaintiffs' request, stating instead that it was "*actively engaged in* enforcement and *policy efforts in this area.*" Letter from James Reilly Dolan, Pl. Ex. D (emphasis added).

---

[3]   In addition, the Transportation Recall Enhancement Accountability and Documentation (TREAD) Act, prohibits the sale or lease of new and used defective and noncompliant motor vehicle *equipment*. *See* Pub. L. 106-414, § 8, 114 Stat. 1800, 1805 (2000) (codified as amended at 49 U.S.C. § 30120).

2.      **The FTC's First Set of Decisions.**

On January 28, 2016, the FTC announced that General Motors Company ("GM"), Jim

Koons Management, and Lithia Motors, which all sell "Certified Pre-Owned" vehicles, had

"agreed to settle separate FTC administrative complaint allegations that each touted how

rigorously they inspect their cars, yet failed to disclose that some of the used cars they were

selling were subject to unrepaired safety recalls." Pl. Ex. E. The Commission stated that Jim

Koons Management, with 15 dealerships in the Mid-Atlantic region, and Lithia Motors, which

has more than 100 stores in the West and Midwest, "are two of the nation's largest used car

dealers." *Id.* The  FTC's Director of the Bureau of Consumer Protection informed the public that

because "[s]afety is one of the biggest considerations for consumers shopping for a car,"

"companies touting the comprehensiveness of their vehicle inspections need to be straight with

consumers about safety-related recalls, which can raise major safety concerns." *Id.*

On February 3, 2016, the FTC published notices of proposed settlements of draft

complaints against the three used car dealers for advertising and marketing "certified" used cars

as "safe," "repaired for safety," or "subject to rigorous inspection," when such cars have

unrepaired safety defects subject to recalls. 81 Fed. Reg. 5751–56 (Feb. 3, 2016). Each of the

draft complaints stated that, in connection with the advertising or marketing of used motor

vehicles, the three companies have "represented, directly or indirectly, expressly or by

implication, that used motor vehicles [they] sell[] have been subject to rigorous inspection,

including for safety issues," and that "[i]n numerous instances in connection" with those

representations, the companies have "failed to disclose, or disclose adequately, that used vehicles

it advertises are subject to open recalls for safety issues." *See, e.g.,* FED. TRADE COMM'N, *In the*

*Matter of Jim Koons Management Company*, Docket No. C-4598 (Pl. Ex. F) at 5. The draft

complaints further stated that these practices constitute deceptive acts or practices in violation of

9

Section 5 of the FTC Act, 15 U.S.C. § 45(a). *Id.* As explained by the FTC, "[i]n numerous instances" when each of these three companies "advertised certified used vehicles that are subject to open recalls for safety issues, it provided no accompanying clear and conspicuous disclosure of this fact[,]" which the FTC regards as a deceptive act or practice under section 5 of the FTC Act. 81 Fed. Reg. at 5752, 5754, 5755.

However, the FTC proposed settling these complaints by allowing the dealers to *continue* to advertise and market "certified" used cars as "safe," "repaired for safety issues," or "subject to a rigorous inspection," when those cars have unrepaired safety recalls, without requiring the dealers to remedy the defects, as long as the dealers include a written disclosure that the vehicle "may" be subject to such recalls and provide information about how the consumer can find such information. *See, e.g.,* 81 Fed. Reg. 5752.

The FTC provided interested persons 30 days to comment on the proposed settlements, s*ee, e.g.,* 81 Fed. Reg. at 5754, and all of the Plaintiffs did so. Plaintiffs, along with every other consumer group and safety organization that commented on the matter,[4] opposed a policy of

---

[4]     In fact, of the 74 comments filed, *all opposed the FTC's proposed settlements* except for a handful of comments from individuals. All of the more than 25 leading consumer/safety organizations who filed comments opposed the proposals, and *no organization or business commented in support of the proposals.* The organizations that opposed the proposals included Plaintiffs, as well as American Association for Justice, Consumer Federation of America, Consumer Action, Consumer Attorneys of California, Consumer Federation of California, Consumer Watchdog, Consumers Council of Missouri, Consumers Union, Courage Campaign Housing and Economic Rights Advocates (HERA), International Association of Machinists and Aerospace Workers, National Association of Consumer Advocates, National Consumer Law Center (on behalf of its low-income clients), Maryland Consumer Coalition, Public Good Tennessee Citizen Action, The Safety Institute, Trauma Foundation, and the Virginia Citizens Consumer Council. *See* https://www.ftc.gov/policy/public-comments/2016/03/initiative-638 (Comments on GM Proposal); https://www.ftc.gov/policy/public-comments/2016/03/initiative-640 (Comments on Lithia Motors Proposal); https://www.ftc.gov/policy/public-comments/2016/03/initiative-639 (Comments on Koons Management Proposal). The proposals were also opposed by Cally Houck, mother of Raechel and Jacqueline Houck, who were ages 20 and 24 when they were killed by a recalled Chrysler PT Cruiser rental car with an unrepaired steering hose defect, and Laura Christian, mother of Amber Marie Rose Harwood, who was

allowing used car dealers to continue to advertise and sell "certified" used vehicles as "safe," "repaired for safety," or subjected to a "rigorous inspection" without first repairing the safety defects. Plaintiffs CARS and U.S. PIRG explained that the proposed settlements would "do more harm than good," as they could "encourage even more unethical and unscrupulous car dealers to engage in reckless practices and play 'used car roulette' with the public's safety." Comments of CARS, et al. (Feb. 29, 2016) (Pl. Ex. G) at 2. They further explained that "[b]ecause of the way auto manufacturers and dealers advertise and promote 'certified' vehicles, they create reasonable expectations that the vehicles are safe and free from unrepaired safety defects," and that "[r]ecent nationwide polling found that a whopping *92% of respondents agreed that when a car is advertised by a dealer as having passed a 125-point inspection, they would expect it to be safe.*" *Id.* at 10 (emphasis added).

As to the proposed required disclosure that the used vehicles "may" be subject to recalls, Plaintiffs explained that "[s]uch a diffuse form of disclosure, appearing in generalized advertising, regardless of whether an individual vehicle has an unrepaired recall or not, is virtually meaningless," and "could also be easily dismissed by the claim [by a dealer that] 'we have to put that notice in all our ads, and on all our cars.'" *Id.* at 3.[5] Plaintiffs pointed out that the

---

killed by a GM vehicle with the defective GM ignition switch defect prior to when the defect became public and GM was forced to issue a safety recall. *Id.* Many of the nation's leading auto fraud attorneys who represent victims of car dealers' illegal practices also opposed the proposals, including Steven Taterka, a former Deputy Attorney General of Indiana, and a former Assistant Attorney General of Tennessee. *Id.*

[5]     This same point was made by "compliance expert Randy Henrick," who advises auto dealers on how to comply with laws and regulations, when he informed the FTC that "as consumers begin to see these notices on all certified used car sales, *they will become insensitive to them and that will hurt the recall [repair] business, which is the exact opposite effect the FTC would like to achieve.* . . ." Nick Zulovich, *Recall Impact on CPO Vehicle Marketing*, AUTO REMARKETING (May 7, 2016, 10:46 AM) (emphasis added), http://www.autoremarketing.com/retail/recall-impact-cpo-vehicle-marketing/.

Commission's proposed resolution of this deceptive practice would also undermine existing practices in the industry whereby particular manufacturers and dealers do *not* allow the sale of used cars subject to safety recalls. *Id.* at 13-14.

Plaintiff Center for Auto Safety similarly commented that the three proposals would place consumers at significant economic and personal risk. Comments of Center for Auto Safety (Feb. 29, 2016) (Pl. Ex. H). The Center also pointed out that the proposed settlements could undercut existing practices in the industry by dealers who do *not* sell unrepaired recalled used cars subject to recall, and explained that "[i]f the proposed orders are finalized in their current form a precedent will be set[,]" and that other dealers would likely opt for the minimum disclosure requirement sanctioned by the Commission, rather than continue to repair used cars subject to recalls. *Id.* at 3-5.

The National Automobile Dealers Association ("NADA"), which represents over 16,000 franchised new car dealers in all 50 states that also sell used cars and trucks, commented that the FTC's actions would, as a practical matter, establish minimum "requirements" for the entire industry. NADA Comments (Feb. 29, 2016) (Pl. Ex. I) (emphasis added). Indeed, NADA assured the FTC that "with regard to the proposed consent order's *prospective disclosure requirements* . . . NADA *will disseminate compliance guidance to its members concerning these requirements and encourage their adoption." Id.* (emphasis added). However, NADA opposed "the process the Commission has employed to address this issue," *id.* at 1, insisting that the agency should have imposed such "prospective" new disclosure requirements on the industry by, for example, issuing a "rule" or "enforcement policy statement" which would be more "particularly apt when seeking to identify and proscribe unlawful conduct that [the Commission] deems to be prohibited

under the broad and vaguely defined prohibitions against unfairness and deception set forth in Section 5" of the FTC Act. *Id.* at 2.

Members of Congress also opposed the FTC's proposed resolution of the problem. By letter dated July 14, 2016, Senators Blumenthal, Schumer, Markey, Nelson, and Durbin informed both the FTC and the Administrator of NHTSA of their "serious safety concerns" regarding the proposed settlements, stating that they believed the proposals "would establish an *anti-consumer, anti-safety precedent with far-reaching policy implications*." Letter to Dr. Mark Rosekind and Edith Ramirez (July 14, 2016) (Pl. Ex. J) (emphasis added). The Senators emphasized that "[t]he sale of any car with an unrepaired safety recall is a threat to public safety." *Id.*[6]

Nevertheless, on December 8, 2016, the FTC issued three final "Decisions and Orders" authorizing GM, Jim Koons Management Co., and Lithia Motors to continue to advertise and market "certified" used vehicles subject to pending safety recalls as "safe," "repaired for safety," and "subject to rigorous inspection," as long as the dealers include a disclosure that such cars "may" be subject to recalls for safety issues that have not been repaired. *See* Pl. Exhs. L-N.

As predicted by consumer organizations and members of Congress—and as anticipated by the agency itself—the FTC's action has had a determinative effect on the behavior of *additional* car dealers. For example, in November 2016 AutoNation, Inc., the nation's largest new car dealership chain, which owns over 290 franchised new car dealerships in 15 states that

---

[6]     Representative Janice Schakowsky, then Ranking Member of the House Subcommittee on Commerce, Manufacturing, and Trade, informed the FTC that the proposed settlements "allow the auto dealers to continue their misleading advertising practices[s]." Letter to Edith Ramirez (Sept. 12, 2016) (Pl. Ex. K). She further emphasized that "[n]ormal consumers assume that the term 'certified,' even with a disclaimer elsewhere in an advertisement, means that the cars are safe and that recalls have been addressed[,]" and that "[t]his is because the certification process removes one of the major drawbacks to buying a used car: *uncertainty about the mechanical condition of the vehicle*." *Id.* at 1-2 (emphasis added).

13

sell "certified" used vehicles, reversed its practice of *not* selling any used vehicle that was

subject to a safety recall until the repairs were made. As reported by the *New York Times*, in

November 2016 AutoNation "began selling some cars with open recalls" based in part on "the

F.T.C.'s decision" regarding other car dealers. *New York Times* (Jan. 27, 2017) (Pl. Ex. O).

Indeed, the *Times* further reported that until the FTC issued its final decisions, "every major car

company had said that they forbade their dealers from selling certified used vehicles with any

open recalls," but that, using the FTC's decision as "cover," Ford Motor Co., which has 2,238

dealerships in the United States, "broke ranks" and gave "permission" to its dealers to "certify

used vehicles that had open recalls after all." *Id.*

### 3.     The FTC's Second Set of Decisions.

On December 22, 2016, the FTC published notice of its intent to settle, on essentially

identical terms, similar complaints against three other major car dealership chains, CarMax

Inc.—the largest retailer of used cars in the country—West-Herr Automotive Group Inc., and

Asbury Automotive Group, Inc. 81 Fed. Reg. 93,926–33 (Dec. 22, 2016) (Pl. Ex. P). Like the

three previous Decisions and Orders, those additional settlements allow the dealers to sell

"certified" used vehicles as "safe," "repaired for safety," and "subject to rigorous inspection"

when such vehicles are subject to unrepaired safety recalls, as long as the dealers disclose to

consumers that the vehicles "may" be subject to a recall. *Id.*

Under the heading "Statement of the Federal Trade Commission Concerning Auto Recall

Advertising Cases," the Commission explained that "[u]nrepaired auto recalls pose a serious

threat to public safety[,]" that "[c]ar manufacturers and [NHTSA] *have recalled tens of millions*

*of vehicles in each of the last several years for defects that pose significant safety risks to*

*consumers[,]*" and that "defects that have been the subject of recalls *have led to severe injuries*

*and even death for many consumers.*" 81 Fed. Reg. at 93,930 (emphasis added). The

Commission further stated that "Section 5 of the Federal Trade Commission Act . . . enables the

Commission to stop car sellers from engaging in false or misleading advertising practices that

mask the existence of open recalls," and it further explained that "*[a]s part of this effort*, the

Commission is issuing final orders against GM, Jim Koons Management Company, and Lithia

Motors, Inc. and announcing proposed orders against CarMax, Inc., West-Herr Automotive

Group, Inc., and Asbury Automotive Group, Inc." *Id.*

Plaintiffs and many others opposed the three additional Consent Decisions on the same

grounds they had previously asserted.[7] However, on March 29, 2017, the FTC issued three *more*

final Decisions and Orders establishing the same permissible practices with respect to these

additional used car dealers. Pl. Exhs. Q-S. Moreover, contrary to the FTC's assertion, Def. Mem.

at 11, the Consent Decisions are not limited to safety recalls where auto dealers are unable to

obtain repairs due to shortages of repair parts. Rather, all six of the Decisions apply to *all* safety

recalls, including those that dealers can readily have repaired. *See* Pl. Exhs. L-N, O-S.

---

[7]     Of the 397 comments filed regarding the proposed CarMax settlement, *all opposed finalizing the proposal*—i.e., *there were no comments in favor of the proposal. See, e.g.,* https://www.ftc.gov/system/files/documents/public_comments/2017/01/17/comment-00012. Comments opposing the proposal were submitted by Plaintiffs, Advocates for Highway and Auto Safety, Consumer Action, Consumer Attorneys of California, Consumer Federation of America, Consumers Union, Courage Campaign, Housing and Economic Rights Advocates, Maryland Consumer Rights Coalition, National Association of Consumer Advocates, National Consumer Law Center (on behalf of its low-income clients), National Consumers League, Tennessee Citizen Action, Trauma Foundation, the Safety Institute, and Virginia Citizens Consumer Council. *Id.* Three additional comments were filed with respect to the Asbury Automotive Group proposal—all of which opposed the proposed settlement, *see* https://www.ftc.gov/policy/public-comments/2017/01/initiative-687, and three additional comments were filed opposing the West-Herr proposal, *see* https://www.ftc.gov/policy/public-comments/2017/01/initiative-689.

C.      **Plaintiffs' Challenge**

Because Plaintiffs believe that the agency's pronouncement that car dealers may sell as "safe" cars that have unrepaired safety defects violates Section 5 of the FTC Act and the agency's own Used Car Rule, Plaintiffs filed a Complaint in this Court challenging the first set of decisions. ECF No. 1. At the same time, in the event the agency argued that all challenges to Consent Decrees and trade regulation rules may only be brought in the D.C. Circuit, and because a 60-day statute of limitations applies to such cases, 15 U.S.C. §§ 45(c), 57a(e), Plaintiffs filed a Petition for Review in that Court and moved to have that proceeding held in abeyance pending the outcome of the district court challenge. *Consumers for Auto Reliability et al. v. Federal Trade Commission*, No 17-1038 (D.C. Cir. Feb. 6, 2017); *id.,* Petitioners' Motion to Stay This Appeal Pending Disposition of Proceedings in the District Court, No. 1665065. When the FTC issued its second round of Decisions, Plaintiffs amended their Complaint in this Court, ECF No. 7, and also filed a second Petition for Review in the D.C. Circuit and again asked that Court to hold that matter in abeyance pending this Court's resolution of this case. Petitioners' Motion to Hold This Case in Abeyance Pending Disposition of Proceedings in the District Court. *Consumers for Auto Reliability et al. v. Federal Trade Commission,* No. 17-1125 (D.C. Cir. July 27, 2017); *id.* No. 1678913.

The FTC however moved to dismiss both Petitions for Review on the grounds that (1) only the subjects of consent orders may bring challenges to such orders in the D.C. Circuit; (2) its decisions were unreviewable under *Heckler v. Chaney,* 470 U.S. 821 (1985); and (3) the Petitioners lacked Article III standing to bring such a case. *See, e.g.,* Opposition of Federal Trade Commission to Motion to Hold Case in Abeyance and Cross-Motion to Dismiss for Lack of

Jurisdiction, No. 1666639 (March 17, 2017). The FTC also asked *this* Court to hold this proceeding in abeyance pending resolution of Petitioners' motion requesting the D.C. Circuit to hold that proceeding in abeyance. Petitioners' Motion to Hold This Case in Abeyance Pending Disposition of Proceedings in the District Court. FTC's Memorandum in Support of Motion to Hold Case in Abeyance, ECF No. 9-1 (May 16, 2017). On June 13, 2017, this Court issued an Order granting the FTC's motion to stay until after the Court of Appeals ruled on Petitioners' Motions to Stay the D.C. Circuit cases. ECF No. 12.

On July 14, 2017, the D.C. Circuit issued an Order granting the FTC's motion to dismiss on the grounds that the Consent Orders are not the kinds of decision that can be challenged in the D.C. Circuit. *Consumers for Auto Reliability et al. v. FTC*, No. 17-1038, No. 1684079 (July 14, 017). Pl. Ex. T. The Court of Appeals held that Plaintiffs may not challenge the Consent Decisions under 15 U.S.C. § 45(c)—the provision that allows subjects of Consent Orders to challenge such decisions within 60 days—and that the Consent Decisions are not "a rule or a substantive amendment to a rule" promulgated under 15 U.S.C. § 57a(a)(1)(B), i.e., the Commission's trade regulation rulemaking authority. *Id.* The D.C. Circuit did not rule on whether the Consent Decrees could be challenged in this Court—i.e., it did not accept the FTC's argument that such a challenge was barred by *Heckler v. Chaney*. Nor did the D.C. Circuit rule on whether the challenged Decisions were "interpretative rules" or "general statements of policy with respect to unfair or deceptive acts or practices in or affecting commerce" within the meaning of 15 U.S.C. § 57a(a)(1)(A). The D.C. Circuit also did not address the FTC's standing arguments.

In light of the D.C. Circuit's ruling with respect to the initial Petition for Review, Plaintiffs moved for voluntary dismissal of their second Petition for Review, which was granted

by the D.C. Circuit on July 27, 2017. Consequently, on August 8, 2017, this Court lifted its stay of proceedings in this Court.

## ARGUMENT

### PLAINTIFFS' CHALLENGE IS REVIEWABLE BY THIS COURT.

#### A.     The Court May Review A Claim That A Consent Decree Violates A Statute or Regulation.

Plaintiffs agree that this Court may not entertain challenges to Consent Decrees brought by the subjects of such Decrees and that such challenges may only be brought in the Court of Appeals. *See* Def. Mem. at 6; 15 U.S.C. § 45(c). However, Defendants are wrong in asserting that Plaintiffs are barred by *Heckler v. Chaney*, 470 U.S. 821 (1985) from challenging the Decisions and Orders at issue in *this* Court. Def. Mem. at 10-11.

Plaintiffs are not challenging FTC decisions *not* to prosecute the used car dealers for engaging in deceptive acts and practices. Rather, they challenge as arbitrary and capricious and otherwise not in accordance with law the agency's determination, enunciated in these six separate Decisions, that it is *not* a deceptive practice under the FTC Act to advertise and sell "certified" used cars as "safe," "repaired for safety," or "subject to rigorous inspection" when such cars are demonstrably *not* safe because they have been recalled by the manufacturer for having one or more safety defects. Thus, for example, the Complaint makes absolutely clear that Plaintiffs challenge the six Decisions at issue as inconsistent with the FTC's own Used Car Rule, issued in 1984, which provides that "[it] is a deceptive act or practice for any used vehicle dealer . . . [t]o misrepresent the mechanical condition of a used vehicle." 16 C.F.R. § 455.1(a)(1) (emphasis added); Amended Complaint, ECF No. 7, at ¶¶ 1, 21-29, 66-67.

The Commission has already determined that such misrepresentations constitute "deceptive and unfair" practices within the meaning of Section 5 of the FTC Act, 15 U.S.C. § 45.

*See* 49 Fed. Reg. 45,692, 45,700 (Nov. 19, 1984) ("[T]he Commission finds that mechanical condition information is material to the used car transaction. *Dealer misrepresentations regarding mechanical condition are therefore deceptive acts and practices*" (emphasis added)). Moreover, in reaching that conclusion, the Commission found that "[t]he utility of a vehicle as a means of transportation is directly affected by its mechanical condition," that "consumer research indicates consumers' consistent concern about mechanical condition," and that "*mechanical condition at the time of sale is reported by consumers as the most important factor in reaching a purchasing decision*." *Id.* (emphasis added).

The Commission further found that "[m]echanical condition information is also important because needed repairs resulting from hidden defects are costly to consumers," and that "out-of-pocket costs caused by defects often go beyond the cost of repairs." *Id.* Thus, the Commission found, "[p]urchasers of defective vehicles can lose their only form of transportation, a loss which may lead to other dislocations, including missed work and loss of wages," that "[o]ther costs may be incurred when *safety-related defects cause or contribute to accidents that damage property and cause personal injury or death*," and that "[t]he impact on the poor from the purchase of a defective used vehicle may be particularly severe, *since an unexpected repair bill may seriously disrupt an already strained budget*." *Id.* (emphasis added).

Despite the Commission's long-standing determination that misrepresentations concerning the mechanical condition of a used car constitute deceptive practices that are prohibited by Section 5 of the FTC Act, the Decisions at issue in this case *permit* car dealers to misrepresent the mechanical condition of used vehicles they sell by allowing them to advertise and market "certified" used vehicles as "safe," "repaired for safety," and "subjected to rigorous inspection," when the vehicles are unsafe, defective, and have not been repaired to remedy the

safety recalls. Thus, pursuant to these Decisions, even when these dealers know or can easily ascertain whether a vehicle does in fact contain a defect that has been recalled—and that left unrepaired *may cause serious injury or death*—the dealer may nevertheless advertise and market those vehicles as "certified," "safe," "repaired for safety," and "subjected to rigorous inspection," as long as they inform consumers that the vehicles "may" be subject to open recalls. Accordingly, it is Plaintiffs' position that the Decisions at issue violate both the FTC Act and the Commission's longstanding determination, announced in its 1984 Used Car Rule, that "[i]t is a deceptive act or practice for any used vehicle dealer, when that dealer sells or offers for sale a used vehicle in or affecting commerce . . [t]o misrepresent the mechanical condition of a used vehicle[.]" 16 C.F.R. § 455.1(a)(1).

It is well settled that a court may review a claim that a consent decree violates an existing statute or regulation. *See, e.g., Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 526 (1986) (acknowledging that parties to a settlement may not "agree to take action *that conflicts with or violates the statute upon which the complaint is based*" (emphasis added)); *United States v. Carpenter*, 526 F.3d 1237, 1241 (9th Cir. 2008) (holding that courts have authority to review allegations that in entering a settlement the agency "exceeded its authority, acted unconstitutionally, or *failed to follow its own regulations*" (emphasis added) (quoting *Guadamuz v. Bowen*, 859 F.2d 762, 767 (9th Cir. 1988)); *Exec. Bus. Media v. U.S. Dep't of Justice*, 3 F.3d 759, 762 (4th Cir. 1993) ("The Attorney General's authority to settle litigation for its government clients *stops at the walls of illegality*." (emphasis added)); *Conservation Nw. v. Sherman*, 715 F.3d 1181, 1185 (9th Cir. 2013) (providing that district courts may consider whether a consent decree "conflicts with or violates" an applicable statute); *Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1128 (D.C. Cir. 1983) (confirming that district courts may

determine whether a settlement "is *consistent with the statute the consent judgment is to enforce*" (emphasis added)).

Indeed, in *Scanwell Labs. v. Shaffer*, the Court of Appeals for this Circuit explained that "there is a 'general rule that official administrative action is reviewable in courts *when a person claims an injury from an act taken by a government official in excess of his powers*.'" 424 F.2d 859, 874 (D.C. Cir. 1970) (emphasis added) (internal quotation omitted). Although that case involved a challenge to an agency's decision to award a contract as violating competitive bidding requirements, the defendant agency argued that such matters are committed to agency discretion and hence are unreviewable under the Administrative Procedure Act—as the FTC argues here. In rejecting that argument, the Court of Appeals emphasized that "[w]hen a prima facie showing of the violation of [agency] regulations has been made *the agency may not be heard to say that the matter in question has been left to its discretion*," and that an agency "may not award a contract illegally under the guise of discretionary action." *Id.* (emphasis added). As the Court succinctly explained, while agencies may exercise discretion on a broad range of issues, "*they may not, however, opt to act illegally*," and "[w]hen the bounds of discretion give way to the stricter bounds of law, *administrative discretion gives way to judicial review*." *Id.* (emphasis added). Here, Plaintiffs allege that, in entering into the six Decisions at issue, the FTC violated both Section 5 of the FTC Act and its own Used Car Rule. Accordingly, Plaintiffs have made the necessary "prima facie showing" of a violation of an agency regulation to survive a motion to dismiss. *Id.*

Accordingly, *Heckler v. Chaney* does not bar this Court from reviewing Plaintiffs' claims. Indeed, that case involved a challenge to an agency's decision *not* to take an enforcement action against a drug company that was allegedly marketing a drug for a use that had not been

shown to be "safe and effective" as required by the Food, Drug, and Cosmetic Act. 470 U.S. at

824. In concluding that the Court lacked the ability to review that claim, the Supreme Court

explained that the Administrative Procedure Act provides for judicial review to any person

"adversely affected or aggrieved" by agency action, "except to the extent that . . . agency action

is committed to agency discretion by law." *Id.* at 828 (quoting 5 U.S.C. § 701(a)(2)). However,

in concluding that the agency's decision not to take enforcement action was "committed to

agency discretion" and hence not reviewable under this "very narrow exception" of the

Administrative Procedure Act, *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410

(1971), the Court distinguished between agency decisions *not* to take an enforcement action and

decisions where an agency *does* act by exercising its discretion. 470 U.S. at 832. In the latter

situation, "[t]he action at least *can be reviewed to determine whether the agency exceeded its

statutory powers.*" *Id.* (emphasis added); *see also id.* at 836 (stressing that even with respect to

decisions *not* to enforce, the Court was *not* deciding whether "an agency's rules might under

certain circumstances provide courts with adequate guidelines for informed judicial review"); *see

also id.* at 838 (emphasizing that the "general exception to reviewability provided by § 701(a)(2)

for action 'committed to agency discretion' *remains a narrow one*" ) (emphasis added) (citing

*Overton Park*, 401 U.S. at 411)).

Thus, nothing in *Heckler* precludes this Court from reviewing Plaintiffs' claims. On the

contrary, *Heckler supports* Plaintiffs' position that because the FTC exercised its discretion in

crafting the Decisions at issue, the Court may review whether in doing so the agency "exceeded

its statutory powers." 470 U.S. at 832; *see also Transp. Intelligence, Inc. v. FCC*, 336 F.3d 1058,

1063 (D.C. Cir. 2003) (*Heckler* does not bar review where "in contrast to the circumstances that

face a court trying to review a failure to take enforcement action, [the challenged agency action]

'provides a focus for judicial review, inasmuch as the agency [did] exercise[] its power,' and

'*[t]he action . . . can be reviewed to determine whether the agency exceeded its statutory*'

*authority*" (emphasis added) (quoting *Heckler*, 470 U.S. at 832)); *Edison Elec. Inst. v. EPA*, 996

F.2d 326, 333 (D.C. Cir. 1993) ("*[N]othing in . . . the holding or policy of Heckler v. Chaney . . .*

*precludes review of a proper plaintiff's timely challenge of an agency's announcement of its*

*interpretation of a statute, even when that interpretation is advanced in the context of a decision*

*not to take enforcement action*" (internal quotation omitted) (emphasis added)).

Indeed, the present case is similar to *Int'l Union, United Automo., Aerospace & Agric.*

*Implement Workers v. Brock,* 783 F.2d 237 (D.C. Cir. 1986), in which a labor union petitioned

the Secretary of Labor to take enforcement action against a company for failing to make certain

reports about unfair labor practice, as required by the Labor and Management Reporting and

Disclosure Act. In response, the Secretary issued a Statement of Reasons stating that the

Secretary had determined that the practices at issue were not covered by the reporting

requirements and, in the subsequent litigation, argued that its decision not to take enforcement

action was unreviewable under § 701(a)(2) of the APA and *Heckler*. In rejecting that position,

the Court of Appeals stressed that if the plaintiff had only challenged that agency's decision not

to take an enforcement action, that decision would be unreviewable, but that "*[n]othing in the*

*Administrative Procedure Act or in the holding or policy of Heckler v. Chaney precludes review*

*of a proper plaintiff's timely challenge of an agency's announcement of its interpretation of a*

*statute*." 783 F.2d at 245 (emphasis added). On the contrary, the Court held that "when a legal

challenge focuses on an announcement of a substantive statutory interpretation, *courts are*

*emphatically qualified to decide whether an agency has acted outside the bounds of reason*." *Id.*

(emphasis added) (citations omitted). Indeed, as the Court further explained, "[e]ven if a

statutory interpretation is announced in the course of a nonenforcement decision, that does not mean it escapes review altogether." *Id.* at 246.

Here, similarly, Plaintiffs petitioned the FTC to take enforcement action against CarMax, the nation's largest retailer of used cars, for advertising and selling used cars as "certified" and subject to "rigorous inspection" when in fact many of those cars are subject to open safety recalls, on the grounds that such practices are "deceptive" trade practices within the meaning of Section 5 of the FTC Act. *See* Pl. Ex. C. In response, the FTC stated that it was "actively engaged in enforcement and other *policy efforts*" to address these issues, Pl. Ex. D (emphasis added), and then issued the first of the three Consent Decisions that allow car dealers to advertise and sell "certified" used vehicles as "safe," "repaired for safety," and "subject to rigorous inspection" even when such vehicles are unsafe, defective, and the safety recall repairs have not been performed, and shortly thereafter issued three more such Decisions, including with respect to CarMax. Therefore, having decided to exercise its discretion in a way that is patently at odds with the agency's own Used Car Rule, which states quite clearly that it is a deceptive practice for any dealer to "misrepresent the mechanical condition" of a used car, the agency may not escape judicial review of that exercise of discretion.

For the same reasons, *Schering Corp. v. Heckler*, 779 F.2d 683 (D.C. Cir. 1985), does not support the agency's position here. That case involved a challenge to an FDA settlement agreement in which the agency had agreed to *delay* an enforcement action against a drug company for a period of time to allow the company to submit an application for approval of the drug at issue. In holding that the settlement was unreviewable under *Heckler,* the Court stressed that the agency's action could not be characterized as a determination that the agency had found the drug at issue to be "safe and effective," but instead "merely postponed any decision with

24

regard to enforcement until it has an opportunity to determine whether [the drug] is, in fact, subject to the Act's requirements." 779 F.2d at 685. Here, by contrast, with the six Decisions at issue, the FTC has officially sanctioned certain dealer practices that squarely conflict with the agency's prior determination that it is unlawful to "misrepresent the mechanical condition" of a used car. Accordingly, the Court's review of Plaintiffs' challenge is not barred by *Heckler v. Chaney*, and the FTC should be required to compile and submit the applicable Administrative Record so that this case may proceed on cross motions for summary judgment.

### B.    The Agency's Decisions Constitute an Interpretative Rule and General Statement of Policy That May Be Reviewed By This Court.

The Decisions at issue also constitute "interpretative rules and general statements of policy with respect to unfair and deceptive acts or practices" within the meaning of the FTC Act, 5 U.S.C. § 57a(a)(1)(A), that may be reviewed by this Court. The FTC misstates the scope of the D.C. Circuit's Order when it asserts that "[t]he Court of Appeals has already ruled that the orders are not rules." Def. Mem. at 1. The Court of Appeals did not address whether the Consent Decisions are interpretative rules within the meaning of either the FTC Act or the APA. Rather, it only ruled that they were not rules covered by § 57a(a)(1)(B) of the FTC Act—i.e., they were not promulgated as substantive trade regulation rules. *See* D.C. Circuit's Order (July 14, 2017), Pl. Ex. T. Therefore, contrary to Defendant's assertion, there is nothing in the D.C. Circuit's Order that precludes this Court from reviewing whether the Consent Decisions are arbitrary, capricious, or otherwise unlawful interpretive rules or general statements of policy.

As the Supreme Court has explained, "the critical feature of interpretive rules is that they are '*issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.*'" *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1204 (2015) (emphasis added) (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995)). And

while such rules, in contrast to "legislative rules," need not be promulgated through notice and comment rulemaking, they nevertheless may be challenged under the APA as being arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law. 5 U.S.C. § 706(2); *see, e.g., Perez*, 135 S. Ct. at 1209; *see also, e.g., Soundboard Ass'n*, 2017 WL 1476116, *2 (D.D.C. 2017) (finding FTC letter concerning whether telemarketing calls using particular technology are subject to agency prohibition on such calls is an "interpretative rule" subject to judicial review).

Here, there can be no question that the six Decisions at issue were designed to inform the public—and certainly the nation's auto manufacturers and car dealers—of the practices that the FTC believes do not run afoul of the FTC Act's prohibition on unfair and deceptive acts. As such, the Decisions clearly are intended to interpret either Section 5 of the FTC Act, the Used Car Rule's pronouncement that it is a deceptive act or practice for any car dealer "[t]o misrepresent the mechanical condition of a used vehicle," 16 C.F.R. § 455.1(a)(1), or both. These Decisions advise not only the six dealers to which they are directed, but also the entire auto industry, of practices that the Commission now believes are permissible—precisely what the FTC's own official candidly touted as the agency's intent in issuing the Decisions when she explained to the industry's main trade publication, that "[w]e really do hope these actions [the Consent Decisions] send a signal to the marketplace as a whole. *We really do want it to have widespread effects*." Pl. Ex. B (emphasis added).

In fact, even the industry's own trade association complained that because the Decisions establish minimum "prospective" "requirements" for the entire used car industry, the FTC's new "policy" should have been issued via a "rule" or "enforcement policy." NADA Comments, Pl. Ex. I.

Therefore, this case is very different from *Neustar, Inc. v. FCC*, 857 F.3d 886 (D.C. Cir. 2017), upon which Defendant relies. Def. Mem. at 12. In that case, the Court of Appeals rejected the argument that the agency's decision to name another company to replace the plaintiff corporation as an administrator under the telecommunications statute was a legislative rule that should have been subjected to notice and comment rulemaking. In reaching that conclusion, the Court stressed that the agency's decision was an "individualized determination" that "was not intended to impact law or policy," and that it did not involve "the announcement of any new principles or rules." 857 F.3d at 895-96. Here, in sharp contrast, not only do these six Decisions directly affect a large percentage of the used car industry—e.g., CarMax *alone* is the largest retailer of used cars in the country—but the agency's own official has acknowledged that the Decisions are intended to instruct the entire industry as to what practices are acceptable under the FTC Act, and, as reflected by NADA's comments, that is precisely how the Decisions are viewed by the industry.

As further demonstrated, these six Consent Decisions are in fact having the "widespread effects" vis a vis the entire auto industry that the Director of the FTC's Bureau of Consumer Protection hoped would occur. Pl. Ex. B. Thus, to the serious detriment of consumers, dealers who previously would *not* have sold a used car that was subject to an unrepaired safety recall without having the defect repaired (*at the manufacturers' expense*, *see* 49 U.S.C. § 30120), are now doing so to conform their practices to those that the Commission has made clear are acceptable. *See supra* at 14 (AutoNation Inc., which owns 290 franchised new car dealerships across the nation, reversed its practice of not selling any used vehicle that was subject to a safety recall until repairs were made based on "the F.T.C.'s decision" regarding dealers subject to the Consent Orders); *id.* (*New York Times* report that "every major car company had said they

forbade their dealers from selling certified used vehicles with any open recalls," but that, using

the FTC's decision as "cover," Ford Motor Co. (which has 3,238 dealerships in the country)

"broke ranks" and gave "permission" to its dealers to "certify used vehicles that have open

recalls"). Indeed, again, NADA, which represents over 16,000 franchised new car dealers in all

50 states who also sell used vehicles, made clear to the Commission that the Consent Decisions

establish minimum "requirements" for the entire industry that NADA would "disseminate" to its

members. Pl. Ex. I.

Such agency pronouncements of general statutory interpretation and policy are also

judicially reviewable regardless of the *form* in which they are embodied.  *See*, *e.g., Soundboard

Ass'n*, 2017 WL 1476116, *2  (FTC letter concerning legality of telemarketing calls is subject to

judicial review); *Int'l Union*, 783 F.2d at 245 ("when a legal challenge focuses on an

announcement of a substantive statutory interpretation, *courts are emphatically qualified to

decide whether an agency has acted outside of the bounds of reason*" (emphasis added));

*Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 676 (D.C. Cir. 1994) ("[A]n agency's

statement of general enforcement policy may be reviewable for legal sufficiency where the

agency has . . . *articulated it in some form of universal policy statement*" (emphasis added)). As

one administrative law expert has opined, "if the language of the document is such that *private

parties can rely on it as a norm or safe harbor by which to shape their actions, it can be binding

as a practical matter*."  Robert A. Anthony, *Interpretive Rules, Policy Statements, Guidance,

Manuals, and the Like—Should Federal Agencies Use Them to Bind the Public?*, 41 DUKE L.J.

1311, 1328-29 (1992) (emphasis added) (quoted in *General Electric Co. v. EPA*, 290 F.3d 377,

383 (D.C. Cir. 2002)).

Here, again, as demonstrated *supra*, the auto industry is already relying on the FTC's recent Decisions as a "safe harbor by which to shape their actions," *id.*—indeed, they are now *abandoning* their prior practices of *repairing* cars subject to safety recalls before advertising and selling them as "safe," "repaired for safety," or "subject to rigorous inspection" to bring their practices in line with the FTC's pronouncement that such remedial measures are not required to avoid engaging in deceptive acts or practices within the meaning of the FTC Act. *See also* Shahan Declaration ("Dec.") (Pl. Ex. U) ¶¶ 3-6. Accordingly, the FTC's pronouncement of its new policy and interpretation on this issue is judicially reviewable for this additional reason.

### C.   **Plaintiffs Have Standing.**

Plaintiffs also have the requisite standing. To satisfy Article III, they must show that (1) they are currently being injured or face an imminent injury; (2) the injury is "fairly traceable" to the challenged action of the defendant; and (3) the injury will "likely" be redressed if Plaintiffs prevail on the merits. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The Court need only find that one Plaintiff has the requisite standing, *Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981), and in determining standing the Court "must . . . assume that on the merits the plaintiffs would be successful in their claims." *Defenders of Wildlife v. Gutierrez*, 532 F.3d 913, 924 (D.C. Cir. 2008) (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003)). Here, Plaintiffs meet all of the requirements for standing.

### 1.   **Injury-in-Fact.**

First, CFAS's and U.S. PIRG's members, and CARS' Officers and Board members, face significant personal and economic injuries from the sale of millions of unsafe used cars, which either they or their family members will purchase, or to which they will otherwise be exposed as they use the nation's roads and highways. See Declaration of Michael Brooks, Pl. Ex. V, ¶¶ 2, 4-

5, 9-11; Declaration of Edmund Mierzwinski, Pl. Ex. W, ¶¶ 2-4, 9-11; Shahan Dec., Pl. Ex. U, ¶¶ 2, 7-9. Indeed, on its website the FTC itself warns the public that "*all safety recalls pose safety risks and, left unrepaired, might lead to accidents*." Pl. Ex. A (emphasis added).

Moreover, contrary to Defendant's assertions, these injuries are far from speculative. Def. Mem. at 9. There are *currently tens of millions of cars subject to safety recalls that have not yet been repaired*. According to the manufacturers' own quarterly reports, there are 37 million repairs that still have not been made with respect to major recalls—i.e., those affecting more than 250,000 vehicles—initiated during 2013-2015. *See* Attachment to Brooks Dec., Pl. Ex. V. Moreover, this does not include any recalls announced *prior* to 2013 or in either 2016 or 2017, nor does it include the many recalls that affect *less* than 250,000 vehicles. Brooks Dec. ¶ 10. If these additional recalls are included, a conservative estimate of unrepaired safety recalls on vehicles currently on the road or sitting on used car lots waiting to be sold is *close to 80 million*. *Id.* Many of these recalls concern defects that can kill or seriously injure the vehicle occupants as well as others involved in a crash, fire, or other harmful event caused by the defect. *Id.* ¶¶ 9-10.

As the FTC itself stated when it issued its second set of proposed Decisions regarding CarMax et al., "[u]nrepaired auto recalls *pose a serious threat to public safety*." 81 Fed. Reg. at 93,930 (emphasis added). As the agency also acknowledged, "[c]ar manufacturers and [NHTSA] have recalled tens of millions of vehicles in each of the last several years for defects that *pose significant safety risks to consumers,*" *id.,* and "defects that have been the subject of recalls *have led to severe injuries and even death for many consumers*." *Id.* (emphases added); *see also* Pl. Ex. A (FTC informing the public that "*all safety recalls pose safety risks and, left unrepaired, might lead to accidents*.").[8]

---

[8]     Such injuries and fatalities can occur shortly after a consumer leaves the lot with a car subject to a safety recall. For example, in 2004 two sisters, aged 24 and 20, were killed when a

Plaintiffs' members and officers can also demonstrate the requisite injury by the mere fact that, as a result of the challenged Decisions, the burden has shifted to them to not only ascertain whether a "safe" vehicle they wish to purchase is subject to an open safety recall, and, if so, either forgo that purchase or expend the time and resources necessary to have the vehicle repaired. Such economic injuries clearly satisfy the injury in fact component of standing. *See, e.g., Ass'n of Data Processing Serv. Org., v. Camp*, 397 U.S. 150, 154 (1970) (providing that those who are "likely to be financially" injured demonstrate a sufficient injury in fact for Article III standing) (citation omitted); *cf. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 184-85 (2000) (finding that plaintiffs suffer an injury-in-fact when they have to make the choice between enjoying a river they have used in the past or refraining from using the river for fear it is polluted).[9]

### 2.   Causation

Second, these injuries are all traceable to the FTC because, as a direct result of the FTC's Decisions, the car dealers subject to the Consent Decisions, as well as *other* dealers, are now advertising and selling "certified" used cars as "safe" when such cars are demonstrably *not* safe.

---

PT Cruiser they had rented from Enterprise rental car company for a vacation caught fire, causing the car to cross the center median and run head-on into a southbound tractor/trailer rig. *See* BEN KELLEY, DEATH BY RENTAL CAR: HOW THE HOUCK CASE CHANGED THE LAW 1-21 (2015). The PT Cruiser they had rented was the subject of an open recall because of a defective power steering pressure hose that led to an under hood fire. *Id.* at 14. At the time of the accident there was no law preventing rental companies from renting vehicles subject to recalls. However, as a result of this horrible incident Congress enacted the Raechel and Jacqueline Houck Safe Rental Act of 2015, which prohibits rental car companies with fleets of 35 or more cars from renting, loaning, or selling defective unsafe recalled cars until the safety defects have been repaired. Pub. L. 114-94, 129 Stat. 1706, § 24109(a) (2015) (amending 49 U.S.C. §§ 30102, 30120, 30122, and 30166, and enacting provisions set out as notes under 49 U.S.C. § 30102).

[9]      In fact, a recent report found that out of a total of 1,699 vehicles offered for sale at eight CarMax dealerships in September 2017, 460 contained unrepaired safety defects subject to outstanding recalls. *See* G. Weissman et al., *Used Car Roulette* (September 2017) (Pl. Ex. X) at 5.

*S*hahan Dec.¶¶ 4-6; *see also Motor & Equipment Mfrs. Ass'n v. Nichols*, 142 F3d 449, 457 (D.C. Cir. 1998) (finding requisite causation for spare auto parts manufacturers who challenged agency decision allowing car manufacturers to comply with federal emission standard through compliance with stricter state standard because this "creates a tremendous incentive" for car manufacturers to make only one kind of each model).

As the Court of Appeals for this Circuit has held, "Supreme Court precedent establishes that the causation requirement for constitutional standing is met when a plaintiff demonstrates that *the challenged agency action authorizes the conduct that allegedly caused the plaintiff's injuries, if that conduct would allegedly be illegal otherwise.*" *Animal Legal Def. Fund v. Glickman*, 154 F.3d 426, 440 (D.C. Cir. 1998) (en banc) (emphasis added). As the Court also observed: "The proper comparison for determining causation is not between what the agency did and the status quo before the agency acted. Rather, *the proper comparison is between what the agency did and what the plaintiffs allege the agency should have done under the statute*." *Id.* at 441 (emphasis added).

Here, Plaintiffs contend—and hence this Court must accept for purposes of determining standing, *Defenders of Wildlife v. Gutierrez*, 532 F.3d at 924—that the FTC should *prohibit*, not authorize, the advertising and sale of "certified" used cars as "safe," "repaired for safety," and "subject to a rigorous inspection" when those cars have unrepaired safety defects. Indeed, Plaintiffs contend that the Commission's contrary Decisions violate the FTC Act and the agency's Used Car Rule which already provides that it is a deceptive act or practice for a used car dealer to "misrepresent the mechanical condition" of a used vehicle. 16 C.F.R. § 455.1(a)(1).

### 3.  Redressability

Third, Plaintiffs can also demonstrate that their injuries would "likely" be redressed if the challenged policy were set aside as unlawful, *Friends of the Earth*, 528 U.S. at 180-81, because this would mean that at least some dealers who repaired used cars before selling them but who have now changed their practices to conform to the FTC's Decisions—e.g., AutoNation and Ford—will return to their prior practices. Shahan Dec. ¶¶ 3-6; *see also Glickman*, 154 F.3d at 443-44 (holding that plaintiff had standing where imposing more stringent requirements advocated by the plaintiff would reduce his exposure to the asserted injuries); *Tozzi v. U.S. Dep't of Health & Human Servs.*, 271 F.3d 301, 310 (D.C. Cir. 2001) (holding that to satisfy Article III, a plaintiff need only demonstrate that it would receive "at least some" relief).

The FTC is wrong when it asserts that there is no redressability because "vacating the consent orders . . . would simply allow the dealers to unlawfully represent their cars as safe or rigorously inspected without clearly disclosing open recalls." Def. Mem. at 9. Not only have Plaintiffs demonstrated that some car dealers would return to their prior practice of repairing defects subject to recalls before offering such cars for sale to consumers, but, as the Supreme Court has held, the fact that an agency may on remand reach the same result does not defeat redressability. *See Fed. Election Comm'n v. Akins*, 524 U.S. 11, 25 (1998) ("If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case—even though the agency (like a new jury after a mistrial) might later, in the exercise of its lawful discretion, reach the same result for a different reason.").

The FTC also wrong asserts that vacating the Decisions at issue would allow car dealers to continue to represent that cars subject to recalls are "safe." Def. Mem. at 9. Not only would nullification of the Consent Decrees demonstrate that the practices permitted by those Decisions

are *not* lawful, but, as demonstrated, *supra* at 5, the states have Unfair and Deceptive Acts or

Practices statutes ("UDAPs") which prohibit entities from engaging in unfair or deceptive

practices.[10] Therefore, whether the FTC remedied this problem by modifying the six Consent

Decrees at issue or simply refraining from *permitting* such practices under the FTC Act,

consumers would also have recourse against such practices under these state statutes and other

provisions of state law,[11] as well as basic product liability jurisprudence—recourse that has been

severely jeopardized as a result of the FTC's unlawful Consent Decrees).[12]

---

[10]     For example, Indiana's UDAP statute provides that it is a deceptive act for a supplier, including a "manufacturer, wholesaler or retailer" to knowingly sell or resell a product to a consumer "if the product has been recalled, whether by the order of a court or a regulatory body, or voluntarily by the manufacturer, distributor, or retailer, unless the product has been repaired or modified to correct the defect that was the subject of the recall." Indiana Code Title 24; Trade Regulation § 24-5-0.5-2 (18).

[11]     For example, California law expressly prohibits dealers from selling or offering for sale a vehicle that is subject to a federal recall due to noncompliance with a federal motor vehicle safety standard. *See* CAL. VEH. CODE § 24011 (West 2016) ("Whenever a federal motor vehicle safety standard is established under federal law (49 U.S.C. § 30101 et seq.), no dealer shall sell or offer for sale a vehicle to which the standard is applicable, and no person shall sell or offer for sale for use upon a vehicle an item of equipment to which the standard is applicable, unless:  (a) The vehicle or equipment conforms to the applicable federal standard."). New York law requires dealers to certify that used cars they offer for sale are "roadworthy," which the City of New York has construed to mean that the vehicles must be free from safety defects subject to recall. Rachel Abrams & Christopher Jensen, *New York City Imposes a Used-Car Repair Rule*, N.Y. TIMES (July 29, 2014), https://www.nytimes.com/2014/07/30/business/new-york-city-imposes-a-used-car-repair-rule.html/; *see also* Press Release, Dep't of Consumer Affairs, New York City's Department of Consumer Affairs Launches Investigation into the Sale of Unrepaired Recalled Used Cars, Aggressively Protecting New Yorkers from Potentially Fatal Defects (July 30, 2014), https://www1.nyc.gov/assets/dca/downloads/pdf/media/Media_News_PR073014.pdf

[12]     Indeed, under the current situation—whereby the FTC has announced to the world that it is *not* a deceptive or unfair practice for an auto dealer to advertise and sell a used car a "certified" used car as "safe" and "repaired for safety" when that car is demonstrably *unsafe* because it is subject to a pending recall—dealers may even be able to avoid liability for a subsequent accident pursuant to a "regulatory compliance defense." *See, e.g.,* Richard C. Ausness et al., *Providing a Safe Harbor for Those Who Play by the Rules:  The Case for a Strong Regulatory Compliance Defense*, 2008 UTAH L. REV. 115, 132 (2008). Vacating the agency's unlawful pronouncement would eliminate that possibility.

There also is no merit to the FTC's argument that vacating the Consent Decisions would allow dealers to "scale back or stop [their] inspection programs"—an argument the FTC made in its motion to dismiss in the Court of Appeals. *See* Motion to Dismiss, No. 17-1125, at 5. Under basic tort law, dealers are already required to inspect the cars they offer for sale. *See, e.g,* 63 AM. JUR. 2d *Products Liability* § 292 (2017) ("[A] used car dealer has a duty of reasonable inspection and testing of vehicles sold to ascertain that a vehicle is equipped with the essentials for safe operation, and to discover and repair any defect that is patent or discoverable in the exercise of ordinary care."). Thus, again, the FTC's decision to permit dealers to represent that cars are "safe," "repaired for safety," and subjected to a "rigorous inspection" when those cars are subject to an open recall provides consumers with *less* protection than they currently have under state law.

For all of these reasons this case is far different than *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930 (D.C. Cir. 2004), which the FTC cited in support of its motion to dismiss Plaintiffs' Petitions in the D.C. Circuit. In that case the plaintiffs had offered nothing more than "unadorned speculation" to suggest that the schools covered by Title IX of the Civil Rights Act would change their practices if the plaintiffs prevailed. *Id.* at 943. Here, Plaintiffs have been able to demonstrate not only that dealers who are not the direct subjects of the Decisions at issue have *already* changed their practices to conform to those unlawful Decisions, *supra* at13-14; Shahan Dec. ¶¶ 3-6, but that the FTC wanted the challenged Decisions to "have widespread effects," Statement of Jessica Rich, Pl. Ex. C, and that the industry's own trade association accepts these Decisions as announcing "prospective" minimum "requirements" for the entire industry. Pl. Ex. I. Accordingly, if the agency's policy is set aside on the grounds that it is unlawful to authorize dealers to advertise and sell as "safe" used cars that are subject to

safety recalls, those dealers—and many others—will likely revert to lawful, and much more consumer protective, practices.  *Id.*

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motion to Dismiss should be denied.

Respectfully submitted,

\_\_/s/_____
Katherine A. Meyer
Meyer Glitzenstein & Eubanks
4115 Wisconsin Ave., N.W. Suite 210
Washington, D.C.  20016
(202) 588-5206
(202) 588-5049 (fax)
Kmeyer@meyerglitz.com

Date:  October 6, 2017