# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CONSUMERS FOR AUTO RELIABILITY AND SAFETY, *et al.*, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | )   No. 17-cv-0540 (KBJ) ) |
| FEDERAL TRADE COMMISSION, | ) ) |
| Defendant. | ) ) ) |

## MEMORANDUM OPINION

In 2016, the Federal Trade Commission ("FTC") pursued enforcement actions against six large car manufacturers/dealerships related to certain marketing practices that those dealers employed with respect to "Certified Pre-Owned" vehicles that are subject to outstanding National Highway Traffic Safety Administration ("NHTSA") safety recalls. The FTC and the dealers settled the claims by entering into six separate consent orders, each of which prohibited the subject dealer from "[r]epresent[ing] that used motor vehicles . . . are safe, have been repaired for safety issues, or have been subject to a rigorous inspection" if said motor vehicle is "subject to any open recalls relating to safety," unless the subject dealer "discloses, clearly and conspicuously, and in close proximity to such representation, any qualifying information related to open recalls" concerning the vehicle, and the advertisement is not otherwise misleading. Gen. Motors LLC, Decision & Order, FTC Matter No. 152 3101 (Dec. 8, 2016) ¶ I.A ("GM Consent Order").[1] Plaintiffs Consumers for Auto Reliability and Safety

---

[1] *See also* Lithia Motors, Inc., Decision & Order, FTC Matter No. 152 3102 (Dec. 8, 2016) ¶ I.A ("Lithia Consent Order"); Jim Koons Mgmt. Co., Decision & Order, FTC Matter No. 152 3104 (Dec. 8,

("CARS"), the Center for Auto Safety, and U.S. Public Interest Research Group ("U.S. PIRG") (collectively, "Plaintiffs") are consumer advocacy organizations that believe that cars that have outstanding recalls are not, in fact, safe, and that the FTC should not have permitted dealers to advertise cars in the manner provided for in the Consent Orders.  Accordingly, Plaintiffs have filed a complaint that alleges that the Consent Orders both violate the Administrative Procedure Act ("APA"), 5 U.S.C. § 551, *et seq.*, and authorize advertisements that are impermissibly deceptive in violation of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a)(1), and FTC regulations.  (*See* Am. Compl., ECF. No 7, ¶¶ 65–67.)

Before this Court at present is the FTC's motion to dismiss Plaintiffs' pleading. (*See* FTC's Mot. to Dismiss ("FTC's Mot."), ECF No. 17.)  As relevant here, the FTC argues, first and foremost, that this Court lacks subject-matter jurisdiction over Plaintiffs' complaint both because Congress has vested the courts of appeal with "exclusive jurisdiction over FTC adjudicatory orders[,]" and also because Plaintiffs lack Article III standing to challenge the Consent Orders, given that the Consent Orders do not injure Plaintiffs in any way and any relief that could result from this litigation is entirely speculative.  (*See* Mem. in Supp. of FTC's Mot. ("FTC's Mem."), ECF No. 17-1, at 9, 11–14.)[2]  The FTC further asserts that the Consent Orders are exempt from APA review.  (*See id.* at 14–17.)  Plaintiffs respond that there is no jurisdictional impediment

---

2016) ¶ I.A ("Jim Koons Consent Order"); Asbury Auto. Grp., Inc., Decision & Order, FTC Matter No. 152 3103 (Mar. 22, 2017) ¶ I.A ("Asbury Consent Order"); West-Herr Auto. Grp., Inc., Decision & Order, FTC Matter No. 152 3105 (Mar. 22, 2017) ¶ I.A ("West-Herr Consent Order"); CarMax, Inc., Decision & Order, FTC Matter No. 142 3202 (Mar. 22, 2017) ¶ I.A ("CarMax Consent Order") (collectively, the "Consent Orders").

[2]  Page number citations to the documents that the parties have filed refer to those that the Court's electronic case filing system automatically assigns.

to this Court's review of their challenge to the Consent Orders—which is brought under the APA and not under the FTC Act itself—and they steadfastly maintain that their members have an injury in fact that is traceable to the FTC's entry of these Consent Orders and that can be redressed if the Court rules in their favor.

For the reasons explained below, this Court concludes that even if the Consent Orders can give rise to a claim under the APA under the circumstances presented here, these plaintiffs do not have Article III standing to pursue any such claim, the gravamen of which relates to potential action (or inaction) of third parties that are not before this Court. Consequently, the FTC's motion to dismiss must be **GRANTED**, and the instant complaint must be **DISMISSED** for lack of subject matter jurisdiction. A separate Order consistent with this Memorandum Opinion will follow.

## I.    FACTUAL BACKGROUND

### A.    The FTC's Enforcement Actions And The Six Consent Orders[3]

#### 1.    The Car Dealers' Practices

The six auto dealers who are the subject of the Consent Orders came to the attention of the FTC sometime before 2016, as a result of the dealers' practice of touting in advertisements the rigorous inspections that they performed on used cars offered for sale, while not disclosing the possible existence of unrepaired safety recalls with respect to those same vehicles.[4] For example, General Motors LLC ("GM")

---

[3] The facts recited herein are not disputed, and are drawn from both the amended complaint and the various documents that Plaintiffs' pleading refers to or relies upon, including documents from the FTC administrative docket and press releases that the FTC has issued.

[4] *See generally* Gen. Motors LLC, FTC Matter No. 152 3101; Lithia Motors, Inc., FTC Matter No. 152 3102; Asbury Auto. Group, Inc., FTC Matter No. 152 3103; Jim Koons Mgmt. Co., FTC Matter No. 152 3104; West-Herr Auto. Group, Inc., FTC Matter No. 152 3105; CarMax, Inc., FTC Matter No. 142 3202.

advertised "Certified Pre-Owned Vehicles," which it claimed were subjected to a "detailed, 172-Point Vehicle Inspection and Reconditioning Process" during which "technicians ensure that everything from the drivetrain to the windshield wipers is in good working order, or they recondition it to our exacting standards[,]" Gen. Motors LLC, Compl., FTC Matter No. 152 3101, at 2 (Jan. 28, 2016) ("GM Compl."); however, GM did not disclose in those advertisements that such a Certified Pre-Owned Vehicle might also be subject to an unrepaired safety recall, *see id.* at 2–3. Similarly, Jim Koons Management Co. ("Jim Koons") advertised the "Koons Used Car Advantage," which purportedly involved "certified mechanics check[ing] all major mechanical and electrical systems and every power accessory as part of our rigid quality controls." Jim Koons Mgmt. Co., Compl., FTC Matter No. 152 3104, at 2 (Jan. 28, 2016) ("Jim Koons Compl."). But Jim Koons's used car advertisements did not contain any disclosures regarding possible open safety recalls concerning the vehicles at issue. *See id.* at 2–3. CarMax likewise offered "CarMax Quality Certified" used cars, and the company claimed that "[e]xperienced technicians put every vehicle through a rigorous Certified Quality Inspection—over 125 points must check out before it meets our high standards." CarMax, Inc., Compl., FTC Matter No. 142 3202, at 1 (Dec. 16, 2016) ("CarMax Compl."). And while CarMax did further disclose the possibility of its used cars having open safety recalls in some instances, it did so in a manner that was not prominent. *See id.* at 3 (noting that "[f]or only approximately three seconds of [a] thirty second [television] commercial, in tiny, blurry white font at the bottom of the screen, the commercial displays text stating that 'Some CarMax vehicles are subject to open safety recalls. See carmax.com for details.'").

The FTC took the position that these car dealers, and three others, had violated Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), by "represent[ing] directly or indirectly, expressly or by implication, that used motor vehicles [they] advertise[] have been subject to rigorous inspection, including for safety issues" without "disclos[ing], or disclos[ing] adequately, that used vehicles [they] advertise[] are subject to open recalls for safety issues[.]" *E.g.*, GM Compl. at 9.[5]  Accordingly, the Commission filed administrative complaints against each of the six auto dealers, proceeding in two waves: the first three complaints issued on January 28, 2016, *see* GM Compl.; Jim Koons Compl.; Lithia Motors, Inc., Compl., FTC Matter No. 152 3102 (Jan. 28, 2016), and the second set of complaints issued on December 16, 2016, *see* CarMax Compl; Asbury Auto. Grp., Inc., Compl., FTC Matter No. 152 3103 (Dec. 16, 2016); West-Herr Auto. Grp., Inc., Compl., FTC Matter No. 152 3105 (Dec. 16, 2016).

       2.    The Settlement Agreements

At the time that the FTC issued each set of complaints against these car dealers, the agency also announced that it had reached proposed settlements with each dealer. (*See* Compl. ¶ 37.)[6]  The terms of the Settlement Agreements vary slightly from dealer to dealer, as explained below.  However, in each of them, the auto dealer at issue faced restrictions with respect to making certain representations when advertising used cars.

---

[5]  Section 5(a) of the FTC Act outlaws "unfair or deceptive acts or practices in or affecting commerce[.]"  15 U.S.C. § 45(a).

[6]  *See also* Fed. Trade Comm'n, *GM, Jim Koons Management, and Lithia Motors Inc. Settle FTC Actions Charging That Their Used Car Inspection Program Ads Failed to Adequately Disclose Unrepaired Safety Recalls* (Jan. 28, 2016); Fed. Trade Comm'n, *CarMax and Two Other Dealers Settle FTC Charges That They Touted Inspections While Failing to Disclose Some of the Cars Were Subject to Unrepaired Safety Recalls* (Dec. 16, 2016).  On the date of the filing of the instant Opinion, these settlement announcements were located at https://www.ftc.gov/news-events/press-releases/2016/01/gm-jim-koons-management-lithia-motors-inc-settle-ftc-actions and https://www.ftc.gov/news-events/press-releases/2016/12/carmax-two-other-dealers-settle-ftc-charges-they-touted.

For example, the agreement between GM and the FTC effectively prohibited GM from

> [r]epresent[ing] that used motor vehicles that Respondent advertises are safe, have been repaired for safety issues, or have been subject to a rigorous inspection, *unless*:
>
>> 1. The used motor vehicles are not subject to any open recalls relating to safety, and the representation is otherwise not misleading, or
>>
>> 2. Respondent discloses, clearly and conspicuously, and in close proximity to such representation, any qualifying information related to open recalls, including but not limited to:
>>
>>> i. the fact that used motor vehicles that it advertises may be subject to recalls for safety issues that have not been repaired, and
>>>
>>> ii. how consumers can determine whether an individual used motor vehicle has been subject to a recall for safety issues that has not been repaired, and the representation is otherwise not misleading.

GM Consent Order ¶ I.A (emphasis added).  The agreement that the FTC reached with GM was the least onerous from the standpoint of the company, insofar as GM merely agreed that when it advertises used vehicles as safe, repaired for safety, or inspected for safety, it will also provide conspicuous disclosures that advise that the advertised motor vehicle may be subject to unrepaired safety recalls, encourage consumers to determine if such is the case with respect to any individual vehicle, and refrain from making any safety-related representations that are otherwise misleading.  *See id.*; *see also* Fed. Trade. Comm'n, *Stmt. of the FTC Concerning Auto Recall Advertising Cases*, at 2 n.4 (Dec. 15, 2016) (explaining that representations that include the required disclosures could nonetheless be misleading, in violation of the Consent Orders, "if a dealer . . .

makes false oral statements to consumers that specific cars are free of recalls, or states a car may be subject to a recall (or otherwise implies it does not know the recall status) but in fact knows the car is actually subject to an open recall").

The five other car dealers agreed to the same obligations as GM concerning their representations about used vehicles that are subject to open safety recalls, but each also "*further*" agreed to various duties in the event that the dealer had received a written notification from a manufacturer that one of its unsold used motor vehicles is, in fact, subject to an open recall for a safety issue.  In that circumstance, the five other dealers agreed to provide that written notice (or a similar notification) "clearly and conspicuously" to the consumer, "prior to the consummation of the sale of that used motor vehicle[.]" Asbury Consent Order ¶ I.A; *see also* CarMax Consent Order ¶ I.A; Jim Koons Consent Order ¶ I.A; West-Herr Consent Order ¶ I.A; Lithia Consent Order ¶ I.A.

In sum, and viewed collectively, the terms of the proposed settlements permitted the dealers to continue advertising vehicles that are subject to pending safety recalls as "safe," "repaired for safety issues," or "subject to a an inspection"—without repairing the defects at issue in the recall—so as long as the dealers (1) made certain disclosures to consumers about the possibility (or fact) of an outstanding safety recall, and, if necessary, the manner in which the consumer could undertake to determine the status of the vehicle at issue, and (2) refrained from otherwise making misleading representations about the vehicle's safety.

Administrative approval of these settlement agreements proceeded through the normal course, with the FTC publishing notices of the proposed settlements in the

Federal Register and affording interested parties 30 days to submit comments. *See* Jim Koons Management Company; Analysis of Proposed Consent Order to Aid Public Comment, 81 Fed. Reg. 5751–56 (Feb. 3, 2016); West-Herr Automotive Group, Inc.; Analysis of Proposed Consent Order to Aid Public Comment, 81 Fed. Reg. 93,926–33 (Dec. 22, 2016). Plaintiffs submitted comments objecting to the terms of the settlements; the record demonstrates that Plaintiffs primarily asserted that the agreements would put consumers and the public at risk, because more vehicles with unrepaired safety defects would be placed on the road (*see* Letter from CARS, *et al*. to Fed. Trade Comm'n (Feb. 29, 2016), ECF No. 18-8, at 4–5), and because consumers would be lulled into thinking cars they purchased were safe, when in fact the cars were defective (*see id.* at 7–8, 11–13). Plaintiffs also objected to the efficacy of the "may be subject to recalls" disclaimer, arguing that it was "virtually meaningless." (*Id.* at 3.)

Despite the objections that the FTC received from Plaintiffs and others, the agency adopted the terms of the first three proposed agreements on December 8, 2016; it adopted the terms of the second three agreements on March 22, 2017. (*See* GM Consent Order; Asbury Consent Order; CarMax Consent Order; Jim Koons Consent Order; West-Herr Consent Order; Lithia Consent Order.) These approvals took the form of "Consent Orders" that the FTC issued on the aforementioned dates, each of which incorporated the terms of the approved settlement agreement.

## B.   Procedural History

### 1.   Plaintiffs' Legal Claims

Plaintiffs filed their initial complaint in this Court challenging the FTC's Consent Orders on March 24, 2017 (*see generally* Compl.); they filed the governing amended complaint on May 2, 2017 (*see generally* Am. Compl.). The operative

pleading asserts claims under the APA, but does not break down Plaintiffs' theories of liability into separate, specific counts.

Notably, with respect to the contention that Plaintiffs have a cause of action to challenge the agency's decision to enter into the settlement agreements with the auto dealers, the complaint maintains that the Consent Orders "embody the agency's interpretation of what is a 'deceptive act or practice' within the meaning of Section 5 of the FTC Act with regard to dealers who advertise and market 'Certified Pre-Owned' vehicles" and, therefore, the Orders qualify as "interpretative rules and general statements of policy within the meaning of the FTC Act, 15 U.S.C. § 57a(a)(1)(A), and the Administrative Procedure Act, 5 U.S.C. § 551(4)." (Am. Compl. ¶ 65.)  As such, according to Plaintiffs, the Consent Orders are subject to judicial review under section 706(2) of the APA.  (*Id.*)  In the alternative, Plaintiffs assert that the Consent Orders "are 'orders' within the meaning of the APA, 5 U.S.C. § 551(5)," and are thus subject to review on that basis.  (*Id.*)

Regardless of how the Consent Orders are construed, Plaintiffs maintain that they are "not in accordance with the law[,]" and therefore violate the APA, because vehicles that are subject to outstanding safety recalls are not in fact safe, and allowing dealers to advertise them as such is "inconsistent with the agency's Used Car Trade Regulation Rule, which provides that it is 'a deceptive act or practice for any used vehicle dealer. . . [t]o misrepresent the mechanical condition of a used vehicle.'"  (*Id.* ¶ 66 (quoting 16 C.F.R. § 455.1(a)(1)).)  Plaintiffs further insist that authorizing dealers to advertise unsafe cars with the mere caveat that the vehicle "may" be subject to a safety recall constitutes arbitrary and capricious agency action in light of the FTC's

own observation in the initial administrative complaints that "it was a deceptive practice under Section 5 of the FTC Act for used car dealers to fail to disclose that vehicles subject to recall 'are' subject to such recalls." (*Id.* ¶ 67.)  Finally, Plaintiffs claim that the Consent Orders contravene the requirement contained in Section 5 of the FTC Act that "'directs' the agency 'to prevent' unfair and deceptive practices" and are therefore not in accordance with the law, are arbitrary and capricious, and amount to an abuse of discretion.  (*Id.* ¶ 68 (citing 15 U.S.C. § 45(a)(2)).)

Ultimately, Plaintiffs ask this Court to declare that the Consent Orders violate the FTC's Used Car Trade Regulation Rule, 16 C.F.R. § 455.1(a)(1); Section 5 of the FTC Act, 16 U.S.C. § 45(a); and the APA, such that the FTC's Decisions and Orders must be set aside.  (*See id.* at 26.)

### 2.   Alleged Injuries To Plaintiffs' Members

It is important for present purposes to note that Plaintiffs have brought this legal action on behalf of their individual members, who will allegedly suffer two types of injuries as a result of the FTC's Consent Orders.  First, Plaintiffs allege that the Consent Orders have exposed their members to an increased risk of physical injury, death, property damage, and financial loss from accidents caused by unrepaired used cars that are subject to pending safety recalls.  (*See* Am. Compl. ¶¶ 5, 8–9, 12–13.) Specifically, Plaintiffs assert that, because the FTC has now permitted car dealers to "advertise and sell 'certified' used cars [that are subject to pending safety recalls] as 'safe, 'repaired for safety,' and 'subject to rigorous inspection'" (*id.* ¶ 5), "used car dealers who previously would not sell [used vehicles subject to pending safety recalls] without repairing them prior to sale are now choosing instead to conform their marketing and sales practices to those sanctioned by the FTC" (*id.*).  As a consequence,

10

Plaintiffs allege, "more unsafe used vehicles with unrepaired safety defects" are being sold and used "on the nation's roads and highways each day" (*id.*), meaning that Plaintiffs' members now face a heightened risk of driving, riding as a passenger in, or sharing the road with an unrepaired used car that causes an accident (*id.*; *see also id.* ¶ 8).

Second, Plaintiffs assert that their members will also suffer "economic and other injuries" from the FTC's Consent Orders, because their members may be tricked into buying a "certified" used car believing it is safe, only to have to incur costs later on to address the outstanding recall. (*Id.* ¶ 8.) To that end, Plaintiffs allege that their members may have to "take time off from work" to get the defects fixed, deal with a "loss of transportation for work and personal use" while their cars are being repaired, and "pay for alternative means of transportation" until the repairs have been completed. (*Id.*)

In Plaintiffs' view, both of the asserted injuries they have identified—the increased risk of harm from future accidents and the economic loss associated with future repairs—are directly traceable to the Consent Orders, insofar as those orders "instruct the entire used car dealer industry that the FTC does not consider it a 'deceptive or unfair act or practice' for dealers to advertise and sell 'certified' used cars subject to safety recalls as 'certified,' 'safe,' 'repaired for safety,' and 'subject to rigorous inspection,' as long as the dealers disclose to consumers that such vehicles 'may' be subject to a safety recall." (*Id.* ¶ 6.) Indeed, according to Plaintiffs, AutoNation Inc., a car dealer that is not constrained by a Consent Order, has already abandoned its prior policy of not selling any used vehicle that is subject to an

unrepaired recall in light of the Consent Orders.  (*See id.* ¶ 54.)  Plaintiffs also point to

the alleged fact that the National Automobile Dealers Association has begun to

publicize and promote the FTC's new position concerning used-car advertisements, by

stating that the organization "will disseminate compliance guidance to its members

concerning the[] requirements [of the Consent Orders] and encourage their adoption."

(*Id.* ¶ 52 (emphasis, quotation marks, and citation omitted).)  Plaintiffs insist that a

favorable court decision would provide sufficient redress for their alleged injuries,

however, because if the FTC's Consent Orders are set aside, "fewer used car dealers

will continue to sell unsafe vehicles."  (*Id.* ¶ 6.)

### 3.    Proceedings In The D.C. Circuit

On February 6, 2017, following the FTC's issuance of the first set of consent

orders, Plaintiffs filed a petition for review in the D.C. Circuit arguing—as they do

here—that the Consent Orders violate sections 5(a) and 18 of the FTC Act, the FTC's

regulations, and the APA.  (*See* FTC's Mem. in Supp. of Mot. to Hold Case in

Abeyance, or in the Alternative, for an Extension of Time, ECF No. 9-1, at 3–4.)  *See

also* Petition for Review, *Consumers for Auto Reliability & Safety v. FTC*, No. 17-1038

(D.C. Cir. Feb. 6, 2017).[7]  Plaintiffs maintain that they initiated the D.C. Circuit action

"out of an abundance of caution[,]" because of the 60-day statute of limitations for

filing actions challenging adjudicatory consent orders in the courts of appeals, and that

they have always believed that the district court is the proper forum for litigating their

challenges to the Consent Orders.  (Pls.' Opp'n to Def.'s Mot. To Hold this Case in

---

[7] Following the issuance of the second set of Consent Orders, Plaintiffs filed an additional petition in
the Circuit that challenges those as well.  *See* Petition for Review, *Consumers for Auto Reliability &
Safety v. FTC*, No. 17-1125 (D.C. Cir. May 2, 2017).

Abeyance, ECF No. 11, at 1–2, 5.)  Accordingly, Plaintiffs filed a motion in the D.C.

Circuit to hold *that* case in abeyance pending resolution of *this* one (*see id.* at 2), and

the FTC responded by filing a cross-motion to dismiss that legal action on standing and

justiciability grounds (*see id.* at 4).  The FTC also filed a motion in this Court to stay

the instant matter pending the D.C. Circuit's resolution of Plaintiffs' motion to stay

proceedings in that court.  (*See* FTC's Mot. to Hold Case in Abeyance, ECF No. 9, at

1.)  On June 13, 2017, this Court granted the FTC's stay motion and stayed the instant

case pending resolution of the D.C. Circuit matter.  (*See* Order Staying Case, ECF No.

12.)

On July 14, 2017, in a one-page per curium order, the D.C. Circuit dismissed

Case 17-1038 for lack of jurisdiction.  (*See* Not. of Filing Attachments to Joint Status

Report ("*CARS I*"), ECF No. 16-1, at 1.)  The Circuit also subsequently dismissed the

second action with prejudice, at Plaintiffs' request, based on the decision in the first

action.  (*See* Joint Status Report, ECF No. 15, at 1.)  In the two sentences of its order

that resolved the substance of the petitions, the D.C. Circuit found that Plaintiffs "are

not subject to the requirements of the consent orders at issue and therefore may not

challenge those orders in this court under 15 U.S.C. § 45(c) (*CARS I* at 1 (citation

omitted)), nor had Plaintiffs "shown that the consent orders should be treated as a rule

or substantive amendment to a rule promulgated under 15 U.S.C. § 57a(a)(1)(B)" (*id.*

(citation omitted)).  Given the D.C. Circuit's ruling, this Court lifted the stay it had

issued with respect to the district court litigation.  (*See* Min. Order of Aug. 8, 2017.)

4.    The FTC's Motion to Dismiss

On September 8, 2017, the FTC filed the motion to dismiss Plaintiffs' amended

complaint for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal

Rules of Civil Procedure, and for failure to state a claim under Rule 12(b)(6), that is before the Court at present.  (*See* FTC's Mot. at 1.)  The FTC's motion makes four arguments in this regard:  (1) that Congress has vested the courts of appeal with exclusive authority to review FTC consent orders, and that only parties bound by such consent orders can seek such review; (2) that Plaintiffs lack Article III standing because their claims arise from the FTC's orders with respect to certain used-car dealers and the resulting behavior of certain other used-car dealers in response to those orders; (3) that the Consent Orders are the product of the FTC's exercise of prosecutorial discretion and thus are exempt from judicial review under the APA; and (4) that Plaintiffs are incorrect when they assert that the Consent Orders are "rules" for purposes of the APA; instead, these agency actions are nothing more than adjudicatory judgments that do not reflect binding FTC policy.  (*See* FTC's Mem. at 5.)  This Court held a hearing on the motion on September 18, 2017, following the submission of Plaintiffs' opposition (*see* Mem. in Opp'n to Mot. to Dismiss ("Pls.' Opp'n"), ECF No. 18) and the FTC's reply (*see* Reply to Opp'n to Mot. to Dismiss ("FTC's Reply"), ECF No. 20).

After the Court held its hearing, Plaintiffs filed two additional documents to support their claim that they have Article III standing:  (1) an October 2019 report written by the Frontier Group, U.S. PIRG's Education Fund, and CARS entitled, *Unsafe Used Cars for Sale: Unrepaired Recalled Vehicles at AutoNation Dealerships* (ECF No. 26-1) ("Frontier Group Report"), and (2) a Consumer Reports article from April of 2019 entitled, *The Hidden Risks of Used Cars* (ECF No. 26-2) ("Consumer Reports Article").

## II.    LEGAL STANDARDS

### A.    Motions To Dismiss Under Federal Rule Of Civil Procedure 12(b)(1)

Federal courts are courts of limited jurisdiction, *see Gen. Motors Corp. v. EPA*, 363 F.3d 442, 448 (D.C. Cir. 2004), and the law presumes that "a cause lies outside [the Court's] limited jurisdiction" unless the plaintiff establishes otherwise, *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  When a defendant moves to dismiss a complaint for lack of subject matter jurisdiction, the plaintiff bears the burden of establishing jurisdiction.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

In evaluating a motion to dismiss under Rule 12(b)(1), the Court must "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged[.]'" *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)).  "Nevertheless, 'the court need not accept factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint, nor must the Court accept plaintiff[s'] legal conclusions.'" *Disner v. United States*, 888 F. Supp. 2d 83, 87 (D.D.C. 2012) (quoting *Speelman v. United States*, 461 F. Supp. 2d 71, 73 (D.D.C. 2006)).  In addition, the court need not "accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice." *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004).

Finally, when the court considers a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1), the court "is not limited to the allegations of the complaint." *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987).  Rather, "a court may consider such materials

outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case." *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000) (citing *Herbert v. Nat'l Acad. of Sci.*, 974 F.2d 192, 197 (D.C. Cir. 1992)).

### B.   Associational Standing

Plaintiffs here have brought the claims on behalf of their members, and are thus proceeding under an "associational" theory of Article III standing. *See Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 100–01 (D.C. Cir. 2019). To demonstrate associational standing at the pleading stage, an organization must plausibly allege that: "(1) at least one of [its] members has standing, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of an individual member in the lawsuit." *Am. Libr. Ass'n v. FCC*, 406 F.3d 689, 696 (D.C. Cir. 2005); *see also Hunt v. Wash. State Apple Advert. Com'n*, 432 U.S. 333, 343 (1977).

With respect to the contention that an individual member has standing, Plaintiffs must plausibly allege facts that satisfy each of the three traditional elements of standing. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). First, the member must have suffered an injury in fact that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical[.]" *Lujan*, 504 U.S. at 560 (internal quotation marks and citations omitted). Second, there must be a "causal connection" such that the member's injury is fairly traceable to the defendant's challenged conduct. *Id.* (citation omitted). And, third, it must be likely that the member's "injury will be redressed by a favorable [judicial] decision." *Id.* at 561 (internal quotation marks and citation omitted); *see also*

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 937 (D.C. Cir. 2004) (explaining the plaintiff must show that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision" (internal quotation marks and citation omitted)), *abrogation on other grounds recognized in Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 620–21 (D.C. Cir. 2017).

Notably, and as relevant here, when "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, much more is needed" to make a plausible allegation of standing to sue. *Am. Fed'n of Gov't Emps., AFL-CIO v. Vilsack* ("*Vilsack*"), 118 F. Supp. 3d 292, 299 (D.D.C. 2015) (quotation marks and citation omitted), *aff'd*, 672 F. App'x 36 (D.C. Cir. 2016); *see also Renal Physicians Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 489 F.3d 1267, 1273 (D.C. Cir. 2007) (explaining that when a plaintiff's claim is based on the government's regulation of a third party, a "heightened showing" is required to establish standing). Specifically, "it becomes the burden of the plaintiff to adduce facts showing that choices of the independent actors have been or will be made in such manner as to produce causation and permit redressability of injury." *Lujan*, 504 U.S. at 562 (internal alteration and brackets omitted). In other words, when "[t]he existence of one or more of the essential elements of standing 'depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict,'" the plaintiff is subject to a higher burden in establishing standing. *Food & Water Watch, Inc. v. Vilsack*, 79 F. Supp. 3d 174, 178–79 (D.D.C. 2015) (quoting *Lujan*, 504 U.S. at 562), *aff'd* 808 F.3d 905 (D.C. Cir. 2015). And, in a similar vein, when a plaintiff's

arguments in support of Article III standing rely on a chain of allegations, a court "may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties) and those which predict a future injury that will result from present or ongoing actions[.]" *United Transp. v. ICC*, 891 F.2d 908 (D.C. Cir. 1989).

## III.   ANALYSIS

Under our constitutional system, the role of the federal courts "is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law[,]" and "[e]xcept when necessary in the execution of that function, courts have no charter to review and revise legislative and executive action." *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009) (citation omitted); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (explaining that Article III of the Constitution limits "federal-court jurisdiction to actual cases or controversies" (quotation marks and citation omitted)).  Standing doctrine "helps preserve the Constitution's separation of powers and demarcates 'the proper—and properly limited—role of the courts in a democratic society[.]'" *Coal. for Mercury-Free Drugs v. Sebelius*, 671 F.3d 1275, 1279 (D.C. Cir. 2012) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  As such, this Court must consider as a threshold matter whether the organizational plaintiffs in the instant case have alleged facts that plausibly establish that their members have "such a personal stake in the outcome of the controversy as to warrant the invocation of federal-court jurisdiction." *New Eng. Anti-Vivisection Soc'y v. U.S. Fish & Wildlife Serv.*, 208 F. Supp. 3d 142, 155 (D.D.C. 2016) (emphasis and brackets omitted) (quoting *Summers*, 555 U.S. at 493); *see also Fed. Forest Res. Coal.*

*v. Vilsack*, 100 F. Supp. 3d 21, 34 (D.D.C. 2015) (noting that the plaintiff bears the burden of establishing standing).

For the reasons explained below, the Court finds that Plaintiffs have not pled facts that, if true, would plausibly establish that their members have standing to challenge the Consent Orders under either of their asserted theories of injury, even if one were to assume that there is a viable cause of action under the APA under these circumstances.[8]

### A.   Plaintiffs Have Not Plausibly Alleged An Injury In Fact Based On Their Asserted Increased Risk Of Harm From Future Accidents

Starting with Plaintiffs' first theory of injury—namely, that the FTC's Consent Orders have increased their members' risk of physical injury, death, property damage, and financial loss from accidents caused by unrepaired used vehicles—the Court notes, first of all, that when a plaintiff claims that an agency action has increased the *risk* of injury from a particular event, "the proper way to analyze [the] claim is to consider the ultimate alleged harm—such as death . . . or property damage—as the concrete and particularized injury[,] and then to determine whether the increased risk of such harm makes injury to an individual citizen sufficiently 'imminent' for standing purposes." *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1298 (D.C. Cir. 2007).  To qualify as concrete and particularized, the asserted harm must be "direct, real, and palpable—not abstract[,]" and it must also "affect the plaintiff in a

---

[8] On the cause-of-action front, the Court notes that Plaintiffs fail to cite a single case in which a court has authorized a plaintiff to bring an APA claim to challenge an adjudicatory order such as the ones at issue here, and the FTC Act itself has a clear and specific set of instructions regarding how such orders are to be challenged.  *See, e.g.*, 15 U.S.C. § 45(c-d).  But because Article III standing is a jurisdictional question that must be addressed prior to any merits-related concern (such as whether the plaintiff has a cause of action), the Court must begin with standing; moreover, in this case, it ultimately need not proceed to address any potential cause-of-action defect.

personal and individual way." *Id.* at 1292 (internal quotation marks and citations omitted).  And for an injury to be imminent, there must be a "*substantial* risk that the harm will occur," as opposed to a "remote, speculative, conjectural, or hypothetical" possibility.  *Food & Water Watch*, 808 F.3d at 914 (emphasis added) (internal quotation marks and citations omitted).

In the context of increased-risk-of-harm injuries, courts in this jurisdiction assess the imminence requirement by asking two questions:  first, whether the agency's action substantially increases the risk of harm (over and above the level of risk that would have existed had the agency taken the plaintiffs' preferred course of action), and, second, whether the "[overall] risk of harm to which [the plaintiffs'] members are exposed, including the increase allegedly due to [the agency's] action, is substantial and sufficient to take a suit out of the category of the hypothetical."  *Pub. Citizen*, 489 F.3d at 1297 (internal quotation marks and citation omitted).  In other words, the plaintiff must plausibly allege that the agency's action has substantially increased the risk of the ultimate harm asserted (*e.g.*, the risk of death or property damage), and that there is a substantial likelihood—given that heightened risk—that the plaintiffs' members will actually suffer the alleged injury.  *See Food & Water Watch*, 808 F.3d at 915.  And the plaintiff's "failure to satisfy either of these prongs . . . deprive[s]" the court "of jurisdiction to hear [the] case."  *Id.*

To offer a simple example of how this test operates in practice, imagine that the Consumer Product Safety Commission ("CPSC") promulgated a regulation that required manufacturers of curling irons to warn users of the risk that the iron could burn a person's scalp and cause damage to surfaces, by placing a bright red label on the back

of the product's packaging.  Imagine further that a consumer advocacy organization challenged this regulation, arguing that the regulation failed to ensure adequate disclosure of these risks; that the CPSC should have required manufacturers to place such labels on the curling iron itself; and that, by promulgating the regulation, the CPSC had exposed the organizations' members to an increased risk of bodily injury or property damage that would result from misusing such curling irons.

To satisfy the first prong of the imminence test, the organization would need to allege facts that, if true, would plausibly demonstrate that placing a warning label on the back of a package leads to a substantially higher risk of injury or property damage than placing the warning label on the irons themselves (i.e., the plaintiff's preferred outcome). *See Pub. Citizen*, 513 F.3d at 238–41 (finding that the plaintiff organization lacked standing where it had not shown that its members were at an increased incremental risk as a result of a NHTSA rule, compared to the alternative rule that the organization desired); *see also Food & Water Watch*, 808 F.3d at 915 (finding that an organization lacked standing to challenge a revised poultry inspection regulation where the organization failed to make a plausible allegation that the regulation substantially increased the risk of foodborne illness when compared to the requirements of existing regulations).  For instance, the organization might point to statistics (or other alleged facts) indicating that consumers face a 20% risk of burns or property damage when the label is placed on the back of a package, whereas they face only a 15% risk of doing so when the warning is placed on the iron itself.  *See Pub. Citizen*, 513 F.3d at 239–40 (evaluating whether the plaintiffs' proffered statistics demonstrated a substantially increased risk of harm); *see also Food & Water Watch*, 808 F.3d at 915–17 (same).

And if the facts alleged plausibly indicate that there has been a substantial increase in the risk of harm, the analysis would then proceed to the second prong of the test, where the organization would have to allege a plausible circumstance that give rise to a substantial probability that their members would experience bodily injury or property damage from misusing the curling irons.  *See Food & Water Watch*, 808 F.3d at 915.

To satisfy this second prong, the organization might allege, for example, that its members frequently purchase and use curling irons, that some of its members live in houses with surfaces that could be scorched by a hot iron, or that some of its members have problems with fine motor skills such that it is substantially more likely they will inadvertently touch their skin with a hot iron.  In so doing, the organization might successfully demonstrate that, because the CPSC's regulation now exposes consumers of curling irons to a 20% risk of burns or property damage, it is likely that some of its members will suffer those consequences.  *See Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1235 (D.C. Cir. 1996) (holding that plaintiffs had plausibly alleged a substantial probability of injury, because their members hiked and camped in the region where an agency's actions heightened the risk of wildfires).  The evaluating court would then also need to determine whether the overall risk of harm to the organization's members makes their asserted injuries likely and impending, as opposed to speculative or remote.  *See Pub. Citizen*, 489 F.3d at 1293–94; *see also Food & Water Watch*, 808 F.3d at 915 (emphasizing that, "in applying the 'substantial' standard," courts must be "'mindful that the constitutional requirement of imminence

necessarily compels a very strict understanding of what increases in risk and overall risk levels count as 'substantial'" (citation and alterations omitted)).[9]

Applying this framework to the instant case, the Court concludes that Plaintiffs have asserted concrete and particularized injuries, but they have failed to make a plausible allegation that the FTC's Consent Order result in a substantial increase in the risk of harm, as the first prong requires.  As mentioned previously, Plaintiffs allege that, because the Consent Orders explicitly authorize car dealers to advertise and sell used cars as certified, safe, and rigorously inspected even when the cars are subject to pending safety recalls, the Consent Orders will increase the number of unrepaired used vehicles on the road (*see* Am. Compl. ¶¶ 5, 8), and that this increase in defective used cars creates a heightened risk of physical injury, death, property damage, and financial loss (*see id.* ¶¶ 5, 8–9).  Plaintiffs further allege that the FTC could have averted this increase in risk if it had *prohibited* car dealers from advertising and selling used cars as certified, safe, and rigorously inspected "without first repairing any defects subject to a pending recall."  (*Id.* ¶ 42; *see also id.* ¶¶ 5, 8–9; Pls.' Opp'n at 38.)

In this Court's view, Plaintiffs' "ultimate alleged harm" is undoubtedly concrete and particularized.  *See Pub. Citizen*, 489 F.3d at 1298.  The D.C. Circuit and the Supreme Court have long explained that physical injuries, death, property damage, and financial loss are quintessential examples of "direct, real, and palpable" harms.  *Id.* at 1292; *see also TransUnion, LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021).  Likewise,

---

[9]  It is worth noting that, while the second prong of the analysis looks at the likelihood that the plaintiff's members will suffer the purported injury, this inquiry is distinct from the question of particularity, which focuses on whether the alleged injury (assuming it happens) affects the plaintiff's members in a personal way.  *See Pub. Citizen*, 489 F.3d at 1292–93, 1295–96.

the physical and monetary injuries that can result from car accidents have an indisputably distinct and personal impact on the individuals harmed.  *See Pub. Citizen*, 489 F.3d at 1292.

Plaintiffs falter at the first step of the imminence test, however, because they have not come close to asserting a plausible allegation that the Consent Orders *increase* the risk of these concrete and particularized harms.  Instead, the facts alleged in Plaintiffs' complaint and supporting declarations indicate merely that many used cars have potentially dangerous defects that are the subject of pending safety recalls, and that a sizeable proportion of those cars have not been repaired.  (*See, e.g.*, Am. Compl. ¶ 33 (asserting that "'[c]ar manufacturers and the National Highway Safety Administration have recalled tens of millions of vehicles in each of the last several years for defects that pose significant safety risks to consumers'"); *id.* ¶ 47 (alleging that "an average of 25% of recalled vehicles are left unrepaired every year"); Decl. of Michael Brooks, Ex. V to Pls.' Opp'n, ECF No. 18-23, ¶ 11 (stating that "a conservative estimate of unrepaired safety recalls on vehicles currently on the road *or* sitting on used car lots waiting to be sold [is] close to 80 million" (emphasis added)).) These alleged facts fail to specify what portion of the risk is attributable to unrepaired "certified" used cars that are now being sold as a result of the FTC's Consent Orders— as opposed to the universe of cars that were sold (by dealers or individuals) prior to the Consent Orders that have since become subject to pending recalls—and thus they are insufficient to demonstrate an *increased* risk of harm.  And while Plaintiffs insist that the FTC's Consent Orders have caused more unrepaired used vehicles to be on the road than there otherwise would be (*see* Am. Compl. ¶¶ 5, 9), that contention is not only

patently conclusory, it also falls short of demonstrating that the alleged increased risk satisfies the established thresholds for imminence in the standing context.

For example, Plaintiffs' submissions do not plausibly suggest that the Consent Orders have *substantially* increased the sale of unrepaired used cars with pending safety recalls.  In this regard, Plaintiffs maintain that one of the dealers subject to the Consent Orders "more than doubled its sales of unrepaired recalled vehicles" between 2015 and 2017 (Decl. of Michael Brooks ¶ 9; Ex. X to Pls.' Opp'n, ECF No. 18-25, at 13), but the relevant Consent Order was not issued until March of 2017 (*see* Am. Compl. ¶ 58), and Plaintiffs' proffered statistics do not indicate how many more unrepaired recalled vehicles this dealer sold after the Consent Orders than it sold before.  Similarly, Plaintiffs have submitted a report that estimates that "1 in 30" of the certified used cars sold by AutoNation—one of the car dealers that allegedly changed its practices in response to the Consent Orders—have "open safety recalls" (Frontier Group Report at 12); yet, that same report states that one of the car manufacturers subject to the Consent Orders has adopted a policy *requiring* dealers to repair certified used cars with open recalls prior to sale (*see id.* at 11), and another article that Plaintiffs have submitted represents that at least seven auto manufacturers "said they had no plans" to allow dealers to begin selling used cars with open recalls following the Consent Orders (Ex. O to Pls.' Opp'n, ECF No. 18-16, at 4).[10]  In the presence of evidence that points in both

---

[10]  Plaintiffs also rely on a study that Consumer Reports conducted entitled, *The Hidden Risks of Used Cars*, to support their position, but that report makes no mention of "certified" used vehicles.  (*See generally* Consumer Reports Article).  What is more, that report notes that some manufacturers, like Honda, have "'advised [] dealers that they should not sell any vehicle, new or used, from any brand, with an unrepaired safety recall[,]'" and says that at least one independent car dealer told Consumer Reports that "he always checks for recalls and that he wouldn't advertise a car as safe if it had an open recall."  (*Id.* at 10.)

directions on the crucial issue of whether more certified used vehicles subject to open recalls are actually being sold now than before the Consent Orders issued, it is difficult to infer from the statistics and reports that Plaintiffs proffer that the Consent Orders have increased the overall number of unrepaired used cars on the road, much less that any increase has been substantial.

A second, and perhaps even more significant, problem with Plaintiffs' assertion regarding the increased number of unrepaired used cars on the road is that Plaintiffs have failed to allege, in a plausible manner, that the risk of car accidents is any greater due to the Consent Orders than it would have been had the FTC forbidden car dealers from advertising and selling such cars as "'safe'" and "'certified[.]'" (Am. Compl. ¶ 9; Pls.' Opp'n at 37.)  As Plaintiffs readily admit, the Motor Vehicle Safety Act does not preclude car dealers from selling unrepaired used vehicles subject to pending safety recalls (*see* Am. Compl. ¶ 33; Consumer Reports Article at 5), and the agency that administers that statute "lacks authority to require used car dealers to fix such defects prior to sale" (Am. Compl. ¶ 33).  Thus, even if the FTC had prohibited car dealers from advertising and selling recalled used cars as "'safe,' 'repaired for safety,' and 'subject to rigorous inspection'" without repairing the defects prior to sale (*id.* ¶ 8), those car dealers would still be free to sell unrepaired used cars as long as they did not advertise them in that manner.

Against this backdrop, and in the absence of any factual allegations contrasting the relative risks of the asserted harms, the Court concludes that Plaintiffs have failed to make a plausible allegation that the FTC's Consent Orders have substantially increased the risk of physical injury, death, property damage, and financial loss as

compared to the risk associated with Plaintiffs' preferred policy. *See, e.g.*, *Pub. Citizen*, 513 F.3d at 239–40 (finding that plaintiffs had not satisfied the first prong of the imminence test because their statistics did not account for crucial factors and did not permit the court to assess whether the challenged regulation increased the risk of harm over the risk from plaintiffs' preferred regulatory approach); *Food & Water Watch*, 808 F.3d at 915–17 (similar).[11]

### B. Plaintiffs Have Not Plausibly Alleged That Their Asserted Injury Based On The Costs Of Repairs Is Fairly Traceable To The FTC's Consent Orders Or Redressable By A Favorable Court Decision

Plaintiffs' alternative theory of injury—that their members will "unwittingly purchase" unsafe used cars as a result of the Consent Orders and then "suffer economic and other injuries" from having to get the cars repaired (Am. Compl. ¶ 8)—fares no better.[12]

For one thing, to the extent that this asserted economic injury depends on Plaintiffs' members being tricked into buying an unsafe car, the Court finds that any such injury cannot be fairly traced to the Consent Orders. As explained earlier, the Consent Orders at issue prohibit car dealers from misrepresenting "whether there is or

---

[11] A plaintiff's failure to satisfy *either* prong of the imminence test deprives a court of jurisdiction. *See Food & Water Watch*, 808 F.3d at 915. Therefore, the Court need not address whether Plaintiffs have plausibly alleged that their own members have a substantial probability of suffering the harm asserted.

[12] Plaintiffs have not specified the "other injuries" to which they are referring. (Am. Compl. ¶ 8.) To the extent that "other injuries" is meant to encompass the need to "pay for alternative means of transportation" and "take time off from work" to get a car repaired (*id.*), the Court construes those asserted injuries as economic injuries. And if Plaintiffs are attempting to allege that their members will suffer an informational injury from having to figure out what repairs may be needed—a suggestion that Plaintiffs make in passing in their opposition brief and supporting declarations (*see* Pls.' Opp'n at 9, 37; Decl. of Michael Brooks ¶ 6)—the Court finds that such allegations have neither been developed sufficiently nor been presented to the Court in an adequate manner. *See Food & Water Watch*, 79 F. Supp. 3d at 196–97 (discussing the facts that a plaintiff must plausibly allege to establish standing based on an informational injury).

is not an open recall for safety issues on any used motor vehicle[,]" and also require car dealers to both "clearly and conspicuously" disclose that advertised cars "may be subject to recalls for safety issues that have not been repaired," and provide information about "how consumers can determine whether an individual used motor vehicle has been subject to a recall for safety issues that ha[ve] not been repaired[.]"  (GM Consent Order ¶ I.A; *see also, e.g.*, Asbury Consent Order ¶ I.A.)  Indeed, five out of the six Consent Orders further require car dealers to disclose affirmatively, prior to the finalization of the sale, that a particular vehicle is subject to an outstanding safety recall if the manufacturer has notified that dealer of the recall.  (*See* Asbury Consent Order ¶ I.A; Jim Koons Consent Order ¶ I.A; CarMax Consent Order ¶ I.A; Lithia Motors Consent Order ¶ I.A; West-Herr Consent Order ¶ I.A.)  Consequently, in order for Plaintiffs' members to make an "unwitting[] purchase" of an unrepaired used car without realizing it was subject to an open safety recall (Am. Compl. ¶ 8), *either* the car dealer who advertised and sold the car would need to have disregarded the Consent Orders' "clear and conspicuous" disclosure requirements (and/or have misrepresented the car's recall status), *or* Plaintiffs' members would need to have overlooked the disclaimers that the car dealer included in response to the Consent Orders.  And under both of these scenarios, the asserted injury to Plaintiffs' members would follow solely from the actions of car dealers or the member themselves—not from the Consent Orders at issue.

Moreover, while the actions of third parties such as the car dealers or Plaintiffs' members can *sometimes* give rise to a redressible injury if such third-party actions are the "predictable effect of Government action[,]" *Dep't of Com. v. New York*, 139 S. Ct.

2551, 2566 (2019), Plaintiffs have not offered a single non-speculative reason to infer that car dealers will predictably ignore the Consent Orders' requirements or that Plaintiffs' members will predictably overlook clear and conspicuous disclaimers, *see id.* (explaining that the causation element would not be satisfied if the respondent's "theory of standing rest[ed] on mere speculation about the decisions of third parties").  Thus, the Court concludes that Plaintiffs have failed to make a plausible allegation that their members will inadvertently buy unrepaired used cars and suffer economic consequences *because of* the Consent Orders.

Plaintiffs' suggestion that their members will suffer economic injuries more broadly (*see, e.g.*, Am. Compl. ¶ 9 (asserting that "Center members are also at increased risk of injury, death, and property damage, and attendant financial burdens by being exposed to accidents caused by other defective used cars that, but for the Decisions and Orders at issue in this case, would not be on the roads and highways, and from being passengers in more used cars that are unsafe") is likewise unavailing, because a successful standing assertion must necessarily include a plausible allegation that a favorable decision from this Court could redress the asserted injuries.  *See Lujan*, 504 U.S. at 560.  Not so here.  As this Court has already explained, the law does not prohibit car dealers from selling used cars subject to pending recalls.  (*See* Am. Compl. ¶ 33; Consumer Reports Article at 5.)  Thus, car dealers would *still* be able to sell unrepaired used cars *even if* the Court set aside the Consent Orders as unlawful, and that reality undermines the conclusion that a judgment in Plaintiffs' favor would actually solve the problem that Plaintiffs have identified.  *See, e.g., Crete Carrier Corp. v. EPA*, 363 F.3d 490, 494 (D.C. Cir. 2004); *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d

658, 671 (D.C. Cir. 1996).  Put another way, if the Consent Orders were voided tomorrow, used car dealers could proceed to sell unrepaired used cars without explicitly advertising them as "'safe,'" "'repaired for safety issues,'" or rigorously inspected nonetheless (Am. Compl. ¶ 1), meaning that Plaintiffs' members would have to "endure the costs associated with having those vehicles repaired" regardless (*id.* ¶ 8).[13]

Undaunted, Plaintiffs insist that their injuries will be redressed if they succeed in this litigation, because "at least some dealers who repaired used cars before selling them but who have now changed their practices to conform to the FTC's [Consent Orders] . . . will return to their prior practices."  (Pls.' Opp'n at 39.)  Even if true, this assertion, standing alone, fails to demonstrate that it is "'likely,' rather than 'speculative'" that auto dealers would resume repairing recalled used cars prior to sale if this Court sets aside the Consent Orders.  *Renal Physicians Ass'n*, 489 F.3d at 1277 (quoting *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005)); *see also Fla. Audubon Soc'y*, 94 F.3d at 670 (noting that establishing standing is difficult where it "depends on predicting the acts of even a single 'interest group' who is unrepresented in the instant litigation, especially when that group . . . is actually composed of dozens of individual actors, each of whom must react to other market or regulatory inputs" (internal quotation marks and citation omitted)).  And, indeed, Plaintiffs' own submissions indicate that a confluence of factors led car dealers like AutoNation to change their policies following the Consent Orders (including a shortage

---

[13]  And while Plaintiffs seem to suggest that any such repairs would cause direct financial harm to their members, under the Motor Safety Vehicle Act, manufacturers are obligated to provide consumers with a safety recall remedy free of charge in most circumstances.  *See* 49 U.S.C. § 30120(a).  This might well be yet another reason why Plaintiffs' allegations of economic injury miss the mark.

of parts to repair some recalls and "other anticipated regulatory rollbacks" (Ex. O to Pls.' Opp'n at 5)), which suggests that car dealers may very well continue to sell unrepaired used cars even if the Consent Orders were invalidated.  *See Renal Physicians Ass'n*, 489 F.3d at 1277 (finding that a plaintiff had not established standing where it was possible that, even if a regulation were rescinded, a third party would not revert to its prior practices).

This all means that the hallmarks of sufficient allegations of an increased risk of harm that is fairly traceable to government regulation of third parties are not present to support the conclusion that Plaintiffs have plausibly alleged standing to sue in this case. In particular, Plaintiffs have never plausibly alleged that the Consent Orders will cause their members to buy unrepaired used cars inadvertently, nor have they plausibly alleged that invalidation of the Consent Orders would redress their asserted economic injuries.  Therefore, the Court readily concludes that Plaintiffs do not have standing to proceed on this alternative theory of harm.

## IV.    CONCLUSION

For the reasons explained above, this Court finds that it lacks jurisdiction over Plaintiffs' complaint because Plainitffs have not pled facts sufficient to establish standing to sue under Article III.[14]  Consequently, and as stated in the accompanying

---

[14]  The Court's conclusion that Plaintiffs do not have standing to bring their suit in federal court does not mean that they have no recourse for their alleged harms.  Given that the law does not currently forbid used car dealers from selling vehicles subject to safety recalls without first making repairs (a fact that dooms Plaintiffs' arguments in this case for the reasons stated above), Plaintiffs' claims are best directed to the "policymaking Branches" of Government, *Pub. Citizen*, 489 F.3d at 1295—which have already promulgated laws prohibiting new car dealers and rental car companies from selling, renting, or loaning recalled cars without making the necessary repairs, 49 U.S.C. § 30112(a)(3); Pub. L. No. 114-94, 129 Stat. 1706, § 24109(a) (2015).

Order, the FTC's motion to dismiss Plaintiffs' amended complaint (ECF No. 17) is

**GRANTED**.


DATE:  September 6, 2021                  *Ketanji Brown Jackson*
                                          KETANJI BROWN JACKSON
                                          United States Circuit Judge
                                          *Sitting by Designation*